[No. S048618. June 24, 1996.]

WESTERN TELCON, INC., et al., Plaintiffs and Appellants, v.
CALIFORNIA STATE LOTTERY, Defendant and Respondent;
CALIFORNIA-NEVADA INDIAN GAMING ASSOCIATION, Intervener
and Respondent.

478

## Counsel

Gibson, Dunn & Crutcher, Shauna Weeks, Robert Forgnone, Seyfarth, Shaw, Fairweather & Geraldson, Jerry M. Hill, Alexander H. Pope and David D. Jacobson for Plaintiffs and Appellants.

Gil Garcetti, District Attorney (Los Angeles), George M. Palmer and Brentford J. Ferreira, Deputy District Attorneys, James P. Fox, District Attorney (San Mateo), Michael R. Capizzi, District Attorney (Orange), George W. Kennedy, District Attorney (Santa Clara), Michael D. Bradbury,

District Attorney (Ventura), Susan Massini, District Attorney (Mendocino), Nielsen, Merksamer, Parrinello, Mueller & Naylor, Paul H. Dobson, John E. Mueller, Steven A. Merksamer and Richard D. Martland as Amici Curiae on behalf of Plaintiffs and Appellants.

Daniel E. Lungren, Attorney General, Roderick E. Walston, Chief Assistant Attorney General, Floyd D. Shimomura, Assistant Attorney General, Linda A. Cabatic, Cathy Christian and Manuel M. Medeiros, Deputy Attorneys General, for Defendant and Respondent.

John Winkelman, Art Bunce, Levine & Associates, Jerome L. Levine, Frank R. Lawrence, Dickstein & Merin, Howard L. Dickstein, Alexander & Karshmer, George Forman, O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears, Glenn M. Feldman, Rapport & Marston, David J. Rapport and Lester J. Marston for Intervener and Respondent.

Fred J. Hiestand as Amicus Curiae on behalf of Intervener and Respondent.

## OPINION

**WERDEGAR, J.**—May the California State Lottery, consistent with its constitutional and statutory authority, operate the game it calls Keno? After examining California law on lotteries and other forms of gambling, we conclude it may not, for a simple reason: California State Lottery Keno is not a lottery. As operated by the California State Lottery, Keno does not meet the statutory definition of a "lottery game" (Gov. Code, § 8880.12) or that of a "lottery" (Pen. Code, § 319), but is instead a house-banked game, in which the participants bet individually against the game's operator, the California State Lottery.

Plaintiffs Western Telcon, Inc., doing business as Pachinko Palace, and the California Horsemen's Benevolent & Protective Association, Inc. brought this action against the California State Lottery (CSL), seeking a declaration CSL Keno is illegal and an injunction against its further operation. The trial court granted CSL's summary judgment motion, denied plaintiffs' cross-motion, permitted the California-Nevada Indian Gaming Association (CNIGA) to intervene as a defendant, and entered judgment for CSL and CNIGA.

The Court of Appeal affirmed, holding that CSL Keno "fully complies" with the provisions of the initiative measure authorizing the state lottery. We

granted plaintiffs' and CSL's petitions for review. Because we conclude CSL Keno is, as a matter of law, not an authorized lottery game, we reverse the Court of Appeal and remand with directions that the superior court be ordered to enter judgment for plaintiffs.

## FACTS

The pertinent facts as to the operation of CSL Keno are described in CSL regulations and are undisputed.

In CSL Keno, participants try to match between 1 and 10 numbers to a set of 20 numbers randomly selected, out of the integers 1 through 80, by a CSL computer. The game is played approximately every five minutes at locations throughout California, known in the regulations as "retailers," which are equipped with CSL computer terminals and video display screens.

The retailer provides the player with a "playslip" with the numbers 1 through 80 on it. The player first chooses and marks on the playslip *how many* numbers, from 1 to 10, he or she wishes to play. This number, according to the regulations, is the "spot." To play the "7 spot," for example, is to select 7 numbers from the field of 1 to 80. The player then selects the numbers to be played, and either places the playslip in the computer terminal or has an employee of the retailer do so. After the gambler pays what is referred to in the regulations as a "wager" of between $1 and $20, the terminal issues a ticket. The ticket is the player's only valid receipt for claiming his or her winnings, if any.

In the alternative, the player can allow the computer terminal to select one to ten numbers. This is called "Quick Pick." The gambler marks on the playslip the spot to be played and that he or she wishes to use the Quick Pick process. The playslip is then inserted in the terminal, and the Quick Pick numbers are selected randomly by the computer, which issues the ticket.

Approximately every five minutes, a central CSL computer randomly "draws" twenty numbers from the integers 1 through 80. It is these 20 numbers that the bettor hopes match the selections on the ticket. The 20 winning numbers are displayed on a video screen at the retailer location.

Payoffs in CSL Keno are "preset" according to a schedule in the regulations. The payoff for a given wager depends only on the spot played and the number of numbers matched. On a $1 wager, the payoff may be as low as $1 (for the 4-spot/2-match category, among others) or as high as $250,000 (for the 10-spot/10-match category).

In CSL Keno, a winner's payoff does not depend on the number of players participating in a particular draw, on the aggregate amount wagered on the draw by all players, or on how many other players made the same winning selection or other winning selections. The "prizes" established for each winning category are not shared among all winners; instead, CSL pays a fixed payoff to each winner no matter how many winners are in a given draw. The regulations provide only one exception to the pre-set payoff schedule: the total payoff on the 10-spot/10-match category for a single draw is limited to $10 million; if the payoff, at a fixed rate of $250,000 for each winning $1 bet, would exceed that amount, "each valid winner's share value for this category shall be calculated as a pari-mutuel prize for a prize pool of exactly $10,000,000."

Payoffs up to $599 may be collected from the retailer, while greater payoffs must be redeemed from a CSL office. The computer terminal itself does not pay out any money.

DISCUSSION

*Constitutional and Statutory Authority*

We begin by reviewing the pertinent statutes and constitutional provisions. Until 1984, the California Constitution had prohibited lotteries since the state's admission. (See Cal. Const. of 1849, art. IV, § 27.) Article IV, section 19, subdivision (a), of the Constitution currently provides: "The Legislature has no power to authorize lotteries and shall prohibit the sale of lottery tickets in the State." In 1984, however, the voters approved an initiative measure (Proposition 37, approved November 6, 1984) creating a state lottery. That measure, among other things, added subdivision (d) to section 19 of article IV, providing: "Notwithstanding subdivision (a), there is authorized the establishment of a California State Lottery." In the same measure, the voters also added subdivision (e), providing: "The Legislature has no power to authorize, and shall prohibit casinos of the type currently operating in Nevada and New Jersey."

From 1851 until 1984, lotteries were also prohibited by statute. (See Stats. 1851, ch. 28, p. 211.) Beginning with the original 1872 Penal Code, the definition of a lottery and the prohibitions on operation of lotteries have been contained in part 1, title 9, chapter 9 of the Penal Code (chapter 9), now consisting of sections 319 through 329. Penal Code section 319, unchanged since its enactment in 1872, defines "lottery" as follows: "A lottery is any scheme for the disposal or distribution of property by chance, among persons who have paid or promised to pay any valuable consideration for the chance

of obtaining such property or a portion of it, or for any share or any interest in such property, upon any agreement, understanding, or expectation that it is to be distributed or disposed of by lot or chance, whether called a lottery, raffle, or gift-enterprise, or by whatever name the same may be known." Penal Code sections 320 through 326 broadly prohibit the operation of lotteries.

Like chapter 9 (title: Lotteries), chapter 10 of part 1, title 9 of the Penal Code (chapter 10) also was part of the original 1872 Penal Code. Chapter 10 (title: Gaming) begins with Penal Code section 330 (section 330), which both defines and specifies the punishment for illegal gaming.[1] Anyone who conducts, plays or bets at any of the listed games for money or other representation of value commits the misdemeanor of illegal gaming. Section 330 specifies a number of games by name ("faro, monte, roulette, lansquenet, rouge et noire, rondo, tan, fan-tan, seven-and-a-half, twenty-one, hokey-pokey"),[2] but it also forbids "any banking or percentage game played with cards, dice, or any device . . . ."

In Proposition 37, the 1984 initiative measure creating a state lottery, the voters, in addition to amending the Constitution as described above, also added chapter 12.5 to title 2, division 1 of the Government Code. Known as the California State Lottery Act of 1984 (see Gov. Code, § 8880), this law (the Lottery Act) creates the California State Lottery Commission (Gov. Code, § 8880.15), which is directed, among other things, to "promulgate regulations specifying the types of lottery games to be conducted by the lottery . . . ." (Gov. Code, § 8880.28, subd. (a).)

" 'Lottery Game' " is defined as "any procedure authorized by the commission whereby prizes are distributed among persons who have paid, or unconditionally agreed to pay, for tickets or shares which provide the opportunity to win such prizes." (Gov. Code, § 8880.12.)

The Lottery Act's only express limitations on the types of lottery games the commission may authorize are contained in Government Code section 8880.28. Among these are that "[n]o lottery game may use the theme of

---

[1] The pre-1872 history of our laws on gaming is colorfully sketched in *In re Williams* (1932) 127 Cal.App. 424, 427-429 [16 P.2d 172].

[2] The curious reader will find descriptions of these games in Singsen, Note, *Where Will the Buck Stop on California Penal Code Section 330?: Solving the Stud-Horse Poker Conundrum* (1988) 11 Comm./Ent. 95, 111-115. Gambling games not prohibited by chapters 9 and 10 (including poker and other so-called "round games" played for money) are generally subject to local control, with some state regulation. (See Pen. Code, § 337s; Bus. & Prof. Code, §§ 19800-19826; *In re Hubbard* (1964) 62 Cal.2d 119, 123-128 [41 Cal.Rptr. 393, 396 P.2d 809]; *Tibbetts* v. *Van de Kamp* (1990) 222 Cal.App.3d 389, 393 [271 Cal.Rptr. 792].)

bingo, roulette, dice, baccarat, blackjack, Lucky 7's, draw poker, slot machines, or dog racing," and that "[i]n games utilizing computer terminals or other devices, no coins or currency shall be dispensed to players from these computer terminals or devices." (Gov. Code, § 8880.28, subd. (a)(1), (3).)

The Lottery Act forbids CSL to use state funds, other than an initial line of credit for start-up costs. (Gov. Code, §§ 8880.3, 8880.61, subd. (b).) The Lottery Act also specifies how lottery revenue is to be apportioned. "As nearly as practical, 50 percent of the total projected revenue, computed on a fiscal-year basis, accruing from the sales of all lottery tickets or shares shall be apportioned for payment of prizes." (Gov. Code, § 8880.63.) CSL's expenses are not to exceed 16 percent of total annual revenues, with the remaining 34 percent or more going to fund public education. (Gov. Code, §§ 8880.4, subd. (a)(2), 8880.64, subd. (b)(1).)

We briefly summarize the parties' chief contentions regarding the application of these laws to CSL Keno. Plaintiffs contend CSL operates Keno as a "banking game" (Pen. Code, § 330), rather than as a lottery, and that CSL Keno is therefore not a lottery game (Gov. Code, § 8880.12) authorized by the Lottery Act. CSL agrees it is restricted to operating lottery games, and that the categories of banking game and lottery are mutually exclusive. In CSL's view, however, its Keno game is a lottery rather than a banking game. Finally, CNIGA argues that even if CSL Keno is a banking game, it is legal because it is a lottery game authorized by the Lottery Act, which prevails over the earlier and less specific provisions of chapter 10.

### CSL Keno Is Not Authorized by the Lottery Act

### The Lottery Act Allows CSL to Conduct Only Lotteries

The Lottery Act authorizes the commission to promulgate rules and regulations for "lottery games" to be conducted by CSL. (Gov. Code, § 8880.28, subd. (a).) Although the Lottery Act does not contain a provision expressly *restricting* CSL to conducting lottery games, both defendants concede CSL may not run any game that does not meet the statutory definition of a lottery game (Gov. Code, § 8880.12) or the definition of a lottery (Pen. Code, § 319). No party suggests otherwise. Any argument that CSL may conduct games other than lotteries would, moreover, be easily refuted by the language of the Lottery Act itself, which refers throughout to *lottery* games and contains no reference to CSL conducting any other type of game (see, e.g., Gov. Code, §§ 8880.29, 8880.30, 8880.31, 8880.32, 8880.47, 8880.48), and by the official materials put before the voters on Proposition 37, which refer throughout to creation of a state *lottery* and

contain no suggestion CSL would be authorized to conduct gambling other than lotteries. (See Ballot Pamp., Prop. 37, as presented to the voters, Gen. Elec. (Nov. 6, 1984) (Ballot Pamp.), pp. 46 [analysis by Legislative Analyst], 48 [argument in favor], 49 [argument against].)

*Banked Games (or Banking Games) Are Not Lotteries*

■ Unchanged since 1872, Penal Code section 319 defines a lottery as "any scheme for the disposal or distribution of property by chance, among persons who have paid or promised to pay any valuable consideration for the chance of obtaining such property or a portion of it . . . ." We have summarized this definition as containing three elements: "(1) a prize; (2) distributed by chance; and (3) consideration." (*Cal. Gas. Retailers* v. *Regal Petroleum Corp.* (1958) 50 Cal.2d 844, 851 [330 P.2d 778]; accord, *Bell Gardens Bicycle Club* v. *Department of Justice* (1995) 36 Cal.App.4th 717, 744 [42 Cal.Rptr.2d 730]; *Finster* v. *Keller* (1971) 18 Cal.App.3d 836, 843 [96 Cal.Rptr. 241].)

The Lottery Act's definition of a lottery game is essentially the same: "any procedure authorized by the Commission whereby prizes are distributed among persons who have paid, or unconditionally agreed to pay, for tickets or shares which provide the opportunity to win such prizes." (Gov. Code, § 8880.12.) The elements of prize and consideration are stated explicitly, while "the opportunity to win" incorporates the element of chance. We therefore agree with defendants CSL and CNIGA, who both assert that the definition of a lottery game (Gov. Code, § 8880.12) is materially indistinguishable from that of a lottery (Pen. Code, § 319).[3]

As we have seen, California law, historically and currently, distinguishes between the operation of lotteries (chapter 9) and other forms of illegal gaming (chapter 10). (See also *People* v. *Postma* (1945) 69 Cal.App.2d Supp. 814, 819 [160 P.2d 221] [" 'Gaming, betting and lotteries are separate and distinct things in law and fact, and have been recognized consistently as calling for different treatment and varying penalties.' "].) This conceptual division is neither novel nor unique to our state. ■ "The three key forms of gambling are gaming, lotteries and betting. Gaming may be defined as 'the playing of any game for stakes hazarded by the players.' A lottery may

---

[3]In this connection, we note that while CSL is exempt, under Government Code section 8880.6, from "[s]ections 320, 321, 322, 323, 324, 325, 326, and 328 of the Penal Code"—chapter 9's prohibitions on operation of lotteries—CSL is *not* exempt from chapter 9's *definition* of a lottery (Pen. Code, § 319). This reinforces our conclusion the drafters of the Lottery Act did not intend to abandon or depart from the long-established definition of a lottery in Penal Code section 319, or the case law interpreting that statute.

be defined as 'a distribution of prizes by lot or chance.' Betting may be defined as 'promise[s] to give money or money's worth upon the determination of an uncertain or unascertained event in a particular way, and (unlike a lottery) may involve skill or judgment.' [Citation.] In the United States, the definition of a lottery usually, but not always, includes the additional element of 'consideration.' [Citation.]" (Blakey, *Gaming, Lotteries, and Wagering: The Pre-Revolutionary Roots of the Law of Gambling* (1985) 16 Rutgers L.J. 211, 214-215, fn. 8.)

While most California decisions on lotteries have concerned the elements of chance (see, e.g., *Finster* v. *Keller, supra,* 18 Cal.App.3d at pp. 844-845; *People* v. *Hecht* (1931) 119 Cal.App. Supp. 778, 784-787 [3 P.2d 399) and consideration (see, e.g., *Cal. Gas. Retailers* v. *Regal Petroleum Corp., supra,* 50 Cal.2d at pp. 857-862), this case requires us to examine the nature of a "prize." More particularly, the case hinges on the distinction between a prize, which is distributed to one or more of the contestants in a lottery, and a wager that is won or lost in bilateral betting on a game of chance. A parallel distinction is to be drawn between lotteries, in which the operator distributes the prize or prizes to the winner or winners, and a banked gambling game, in which the operator pays off all winning wagers and keeps all losing wagers.

A lottery must involve distribution of one or more prizes, rather than mere bilateral wagering. "A prize must be distinguished from a bet between two persons upon an uncertain future event." (71 Ops.Cal.Atty.Gen. 139, 146 (1988).) When two parties wager against one another on the outcome of a game, they engage only in *gaming.* (See *In re Williams, supra,* 127 Cal.App. at p. 427 [" 'It is betting on the game that constitutes gaming, and those game or gamble who thus bet.' "].) The bettors do not thereby conduct a lottery, for neither of them has offered up any property as a prize to be distributed to others.

A wager between two parties may be won by either of them. Each of the two has a chance to win the stake of the other and retain his or her own stake; neither puts up any property to be disposed of or shared by *others* according to chance. In contrast to a wager, a " 'purse, prize, or premium is ordinarily some valuable thing offered by a person for the doing of something by others, into the strife for which he does not enter. He has not a chance of gaining the thing offered; and, if he abide by his offer, that he must lose it, and give it over to some of those contending for it, is reasonably certain.' " (*Hankins* v. *Ottinger* (1896 115 Cal. 454, 458 [47 P. 254]; accord, *Bell Gardens Bicycle Club* v. *Department of Justice, supra,* 36 Cal.App.4th at

p. 747.) In other words, as CSL explains in its brief, "[a] lottery operator does not 'wager' or hazard his property against that of others. *Whether* the property offered by the lottery operator will be distributed is not the issue, as it is in gaming; in a lottery, the only issue is *to whom* will the property be distributed—and the lottery operator, earning his revenue as a portion of the ticket sales, is not himself a contender for the prize." (Italics in original, fn. omitted.)

The distinction between a prize and a bilateral wager is further explained, as well as illustrated, in *People* v. *Postma, supra,* 69 Cal.App.2d Supp. 814. The defendants in that case were alleged to be engaged in bookmaking on horse races run at various tracks around the country. They allegedly took bets on horses to win, place or show, keeping all losing wagers and paying all winners at the odds determined at the racetracks. While payoffs at the various tracks were determined by the pari-mutuel system—under which all bets are pooled and the net prize (after the operator's deduction) is shared by all the winning bettors—the same was not true of the alleged bookmaking operation: instead, the defendants "paid the winning bettors the amounts determined at the tracks, regardless of the total amount oi the bets placed with them, and even though on any particular race such amount was not sufficient to pay the winners." (*Id.* at p. Supp. 816.)

The defendants in *Postma* successfully demurred to a complaint which charged them with operating a lottery, as defined in Penal Code section 319. The appellate court affirmed. Applying the tripartite definition of lottery, the court found the first element unmet because "[t]here was nothing put up as a prize." (*People* v. *Postma, supra,* 69 Cal.App.2d at p. Supp. 818.) Rather, the allegations showed "simply betting or wagering, each bettor for himself dealing with the defendants as the other bettor." (*Ibid.*) The court explained that "[w]hen two persons bet with each other, it cannot be said that either of them . . . has offered any property for disposal or distribution to persons who have paid a consideration for the chance of obtaining it." (*Ibid.*)

The *Postma* court conceded that when horse race gambling was conducted on a pari-mutuel basis, the scheme (leaving aside the question of chance) might be considered a lottery. But the defendants' alleged operation was not run on a pari-mutuel basis. "We have no such pooling scheme presented here, but only individual bets, which defendants must pay to the winners regardless of the amount of money the defendants may have received from other bettors or even though they have received none at all, all bets being on the winning horse." (*People* v. *Postma, supra,* 69 Cal.App.2d at p. Supp. 818.) The complaint thus failed to show the defendants were running a lottery. (*Id.* at p. Supp. 819.)

To summarize, the scheme in *Postma* was not a lottery because the operators offered no prize for disposal or distribution to others. Instead, they bet individually against each participant on the outcome of a race. In each bet, the operators had a chance to win the other bettor's stake and retain their own. In each bet, by the same token, the operators risked losing their stake. Unlike a lottery operator, who has offered a prize for reasonably certain disposal and has no interest in the outcome of the chance device by which the winner or winners are chosen, the operators in *Postma* had an interest in the outcome of each bet. It was possible, at least theoretically, that the operators might win all the bets in a given race or, as the court noted, that they might lose all the bets, "all bets being on the winning horse." (*People* v. *Postma*, *supra*, 69 Cal.App.2d at p. Supp. 818.)

In *Postma*, the operators made more than one bilateral wager on each race. This is the case with most commercial gambling, including many common gambling games. ■ When one party wagers simultaneously against a number of others on the outcome of a game, the scheme is a called a banked game or, in the words of our statute (§ 330), a "banking game." This court first defined the term "banking game" in *People* v. *Carroll* (1889) 80 Cal. 153, 157-158 [22 P. 129], accepting as "sufficiently accurate" the definition given by a witness at trial: " '[A] game conducted by one or more persons where there is a fund against which everybody has a right to bet, the bank being responsible for the payment of all the funds, taking all that is won, and paying out all that is lost. The fund which is provided for that purpose is generally called the bank, and the person who conducts it the banker.' " With variations in phrasing, this definition has been accepted and applied by California courts in many cases since. (See, e.g., *Tibbetts* v. *Van de Kamp*, *supra*, 222 Cal.App.3d at p. 393; *Sullivan* v. *Fox* (1987) 189 Cal.App.3d 673, 678 [235 Cal.Rptr. 5]; *In re Lowrie* (1919) 43 Cal.App. 564, 566 [185 P. 421].) As succinctly stated in *People* v. *Ambrose* (1953) 122 Cal.App.2d Supp. 966, 970 [265 P.2d 191], "[i]n a banking game the banker or exhibitor pays all the winnings and suffers all the losses; he is the one against the many, which is the supreme test of a banking game."

Superficially, some banking games may resemble some forms of lottery. Many of the common devices for generating chance outcomes, such as numbered wheels, ball hoppers, playing cards and computer programs generating random numbers, can be used for lotteries as well as to run banking games. In both there is one operator; in both, typically, there are many participants. In both lotteries and banking games each of the participants may win or lose money depending on a chance outcome.

These two categories of gambling are nonetheless exclusive of one another, and can be surely distinguished, not by the manner of play, but by *the*

*nature of the betting itself.* (See, e.g., *In re Lowrie, supra,* 43 Cal.App. 564, 566-567 [complaint, alleging petitioner ran game in which the other participants bet against him on the outcome of a roll of dice, charged operation of a banking game, not a lottery, since petitioner allegedly kept a fund against which the other participants bet].) In a lottery the operator does not bet against any of the participants, but merely offers up a prize for distribution to one or more of them. The operator, in other words, has no interest in the outcome of the chance event that determines the winner or winners—the "game" or "draw"—because neither the fact the prize will be disposed of, nor the value of the prize to be distributed, depends upon which, or how many, of the lottery entrants might win it. In a banking game, in contrast, the operator does compete with the other participants: "he is the one against the many." (*People* v. *Ambrose, supra,* 122 Cal.App.2d at p. Supp. 970.) The operator thus has a direct interest in the outcome of the game, because the amount of money the operator will have to pay out depends upon whether each of the individual bets is won or lost.

One corollary of the distinction drawn above is that the operator of a banked game may or may not, depending on the outcome of the game, be obliged to pay out more than the amounts wagered on a particular game. Moreover, an extraordinary run of bad luck on the part of the house may unpredictably deplete its funds. A bank, in theory, can be "broken." A lottery can never be broken in this sense. True, if a lottery operator offers a fixed prize—a particular automobile or piece of real property, for example—the ticket receipts may be insufficient to cover the cost. But the operator's success or failure in such a lottery depends only on *how many* entries are attracted, not on *which participant, or how many participants,* win the prize. The outcome of the game or draw, in other words, does not determine whether the lottery operator makes or loses money on that game or draw.[4]

### *CSL Keno Is a House-banked Game Rather Than a Lottery*

The question whether a particular described game is a lottery or a banking game, or neither, is a question of law. (*Bell Gardens Bicycle Club* v. *Department of Justice, supra,* 36 Cal.App.4th at pp. 742-743; *Sullivan* v. *Fox, supra,* 189 Cal.App.3d at p. 678.) In determining the character of CSL Keno,

---

[4]The same is true when, as is common, the lottery prize is made up of the pooled entry fees, less some percentage deducted by the operator. In such a lottery the prize cannot exceed the operator's revenues. Again, the success or failure of the operator's commercial scheme does not depend, even theoretically, on the outcome of the chance event. (See *Brown* v. *California State Lottery Com.* (1991) 232 Cal.App.3d 1335, 1339 [284 Cal.Rptr. 108] ["Parimutuel operations like the lottery do not contract with bettors; instead they serve only as stakeholders for the wagers with no interest in the outcome."].)

we simply compare its operation, as described in CSL regulations, to the definitions set out above.

In CSL Keno, each player places a wager on the outcome of the "draw" of random numbers. If the player loses, CSL keeps the wager. If the player wins, CSL pays the player a preset amount, based only on the amount of the wager, the number of numbers selected and the number of numbers matched. The payoff to any given player does not depend upon how much money was wagered by others, either in total or on the same winning numbers.

This scheme is clearly a banking game, with CSL acting as the bank, rather than a lottery. CSL is "the one against the many, which is the supreme test of a banking game." (*People* v. *Ambrose, supra*, 122 Cal.App.2d at p. Supp. 970.) After the draw, CSL pays off on all winning bets and collects all losing bets; CSL offers no prize for distribution to others, but simply bets individually against each of the other participants. As CSL itself notes, a *lottery* operator "is not himself a contender for the prize." But in CSL Keno, CSL does in fact "contend" for each wager, since it has a chance to win each of the wagers placed by the players.

Because of the preset payoff schedule, CSL has an interest in the outcome of each draw: depending on that outcome, it may have to pay off many large winners, few or none, and may retain many large losing wagers, few or none. Its financial success in each draw depends, theoretically, on the outcome of the game. The total amount of money paid out by CSL on a game of Keno is not, as in a lottery, either fixed in advance or determined by the total amount wagered; instead, it depends on the outcome of the draw—on how many players win the game and how many lose, as well as on which players win and which lose.[5]

As a federal court has held in connection with a keno game substantially identical to CSL Keno, "Keno is a 'house percentage banking game' in which the house pays all winners and collects from all losers. The house essentially acts as a player in the game which 'takes on' all other players. Thus, the house has a stake in the outcome of the game." (*Sisseton-Wahpeton Sioux Tribe* v. *U.S.* (D.S.D. 1992) 804 F.Supp. 1199, 1202; see also *Poppen* v. *Walker* (S.D. 1994) 520 N.W.2d 238, 247 ["video lottery" machines that

---

[5]These characteristics are not shared by all CSL's games. In both Super Lotto and Fantasy 5, for example, most prizes are calculated as equal shares of all money in the prize pool for the prize category. The amount of CSL's payout in these categories is thus not dependent on the outcome of the draw, assuming there is at least one winner in the category. In both these games, however, prizes for matching only three numbers are fixed; to this extent, therefore, the games may suffer from the same faults as the fixed prizes in CSL Keno.

played keno and other games held to be "game of chance" rather than "lottery," in part because each individual player played against the machine, rather than in large group as typical of a lottery]; 1981 Ops. N.Y. Atty. Gen. 68, 77 [proposed video games not authorized under state lottery law because, among other reasons, the player does not play against other participants, but "plays only against the 'house' "].)[6]

CSL makes several arguments for characterizing its Keno game as a lottery rather than a banking game. None is persuasive. First, CSL argues that the term "lottery" has been liberally construed as taking in every scheme, whatever its peculiarities of play, that involves the elements of prize, chance and consideration. We agree; indeed, the pertinent statutes refer to "any scheme" (Pen. Code, § 319) and "any procedure" (Gov. Code, § 8880.12) having these elements. As demonstrated above, however, CSL Keno does not involve the distribution of any *prize*, but only simultaneous bilateral wagering between CSL and the other participants.

Second, CSL points out a lottery may involve fixed prizes—the operator need not make up the prizes from the pooled ticket sales. CSL gives the example of a 19th-century public lottery scheme in which " 'the grand prize of $30,000 went to the ticket bearing the first, second and third numbers drawn, in that order.' " Similarly, John Scarne describes the Puerto Rican lottery, reestablished in 1924, as offering a $100,000 first prize, $36,000 second prize, and so on. (Scarne, *supra*, at p. 154.)

We agree that the pari-mutuel system is not the only way to operate a lottery. Nothing in Government Code section 8880.12 precludes CSL from operating a lottery game involving fixed prizes. In a fixed-prize lottery, however, the *total* prize amount must be fixed in advance of the draw. If fixed prizes are offered, in other words, the number of such prizes must also be determined in advance of the draw. If the number is not fixed—if, for

---

[6]Some decisions from other jurisdictions have held "keno" to be a form of lottery, or stated so in dictum, but on examination the game referred to is found to be materially different from keno as conducted by Nevada casinos and CSL. This "old-fashioned Keno" (Scarne's New Complete Guide to Gambling (2d ed. 1974) p. 490 (Scarne)) was a form of bingo, in which cards with numbers were purchased from the operator, who then called out randomly chosen numbers, which the players covered on their cards. The first player to cover all the numbers on the card, or in a row of the card, won the prize. (See *Boasberg* v. *United States* (5th Cir. 1932) 60 F.2d 185, 185-186; *People* v. *Welch* (1934) 269 Mich. 449 [257 N.W. 859, 859-860]; see also *Harris* v. *Missouri Gaming Com'n* (Mo. 1994) 869 S.W.2d 58, 64 [holding keno to be a lottery because keno is a version of bingo, which is itself a lottery].) An opinion of the California Attorney General also describes a keno game as a lottery, but the only issue addressed in that opinion was whether the element of consideration was present, prize and chance having been submitted as without dispute. (64 Ops.Cal.Atty.Gen. 114, 116 (1981).)

example, a set payoff is made, without limitation, to every person correctly guessing a randomly generated number—the scheme is not a lottery, but a banking game, since the operator in such a game is, in effect, wagering against each participant that he or she will not correctly predict the number. The operator's total payout in such a scheme depends on the outcome of the game, i.e., the random number choice. That is the case with CSL Keno, in which CSL pays a fixed amount, without limitation, to each person who predicts a certain number of the 20 numerals drawn.[7]

Third, CSL contends it is immaterial that, under its preset payoff schedule, the revenues for a given game may be less than the total payout. CSL asserts its "prize" schedule has been constructed so as to result, according to probability calculations, in an expected payout of around 50 percent in any given draw. In any event, CSL further argues, any deficiency in a given Keno draw may be made up through surplus from previous or subsequent draws, or even from other CSL games. In operation, therefore, CSL Keno complies with the Lottery Act's requirement that, "[a]s nearly as practical," 50 percent of total revenue be paid in prizes. (Gov. Code, § 8880.63.)

The flaw in CSL Keno, however, is not that it fails to comply with the 50 percent requirement, but that it is not a lottery. It is a banking game in which the payoffs have been adjusted to produce a house advantage of around 50 percent. (The house advantage for the substantially identical game of keno played at Nevada casinos is around 20 to 25 percent. (Scarne, *supra*, at pp. 498-499.)) That CSL is able, in practice, to conduct its Keno game without a substantial risk of being unable to pay off on winning bets is reassuring, but legally irrelevant. The same is true of Nevada and New Jersey casinos, which run banking games such as blackjack and roulette (and keno) without substantial risk of their banks being "broken." In all such games, however, it remains true that in a given game, or "draw," the total payout depends on the outcome of the game, and thus may *in theory* exceed the total wagers. As explained earlier, this is not true of a lottery, which can never fail financially as a result of the operator's bad luck in the draw. Although revenues in a fixed prize lottery may be less than the value of the prize, such a shortfall results in no way from the outcome of the draw itself, but only from the insufficient number of tickets bought.

CSL also argues that its Keno game is a lottery because any excess *winnings* CSL experiences (that is, more than 50 percent of revenue) are

---

[7]As described earlier (*supra*, p. 481), the only exception to the preset payoff schedule occurs if more than $10 million should be won in the 10-spot/10-match category, in which case the payoffs for that particular category are determined as parimutuel shares of a single $10 million prize. In that event, CSL Keno would operate as a lottery as to that particular prize category. Such a limited and conditional feature of operation, however, cannot save the scheme as a whole.

eventually used to pay prizes in Keno or other games, so that the total payout for all CSL games is approximately 50 percent of revenues. As the argument is stated in CSL's brief, "the balance in the prize pool can be 'rolled over' for subsequent play." We find this argument equally unpersuasive, for the following reasons.

At the risk of repetitiousness, we reiterate that CSL Keno payouts to bettors are not calculated as shares of a "prize pool." With the single contingent exception for the 10-spot/10-match category, described earlier (*supra*, p. 481), CSL Keno "prizes" are paid according to a fixed schedule that depends neither on the revenues from that draw or the previous draws, nor on the number of winners in each category. The regulations define "prize" ("the compensation provided for a valid winning KENO selection(s)") and "pool" ("all of the selections made by all players purchasing tickets for a drawing period . . ."), but not "prize pool," and we have located only one use of that phrase in the regulations, to describe the $10 million maximum available for paying prizes in the 10-spot/10-match category. Since, with this exception, CSL Keno thus does not employ a "prize pool" for calculating prizes, and since even the contingent 10-spot/10-match prize pool is fixed rather than determined by prior results, it is unclear in what respect unexpected winnings from CSL Keno might be "rolled over" to a "prize pool" for subsequent play.[8]

The Lottery Act does provide for a "State Lottery Fund," into which all ticket sales revenues are to be deposited and from which prizes, expenses and transfers for education are to be made. (Gov. Code, §§ 8880.61, 8880.62.) CSL's unexpected winnings from Keno, if any, are presumably maintained in this fund and eventually "rolled over" into payments of prizes on Keno or other games, so as to maintain a total apportionment of 50 percent payout in prizes. Although Keno prizes are fixed, prizes for some other games are calculated as shares of a pool, which could conceivably be augmented with excess revenue from Keno; in Super Lotto, for example, CSL has discretion to augment the 6 of 6 prize pool with a cash contribution before the draw.

This general "rollover" into prizes for other drawings or other games is insufficient, in our view, to transform CSL Keno from a banking game into a lottery. The question before us is whether CSL operates *Keno* as a lottery,

---

[8]In contrast, the prizes for Super Lotto, for example, are calculated as shares of a "prize pool" consisting of approximately 50 percent of total sales for the draw period. The Super Lotto regulations further provide that if there is no winner for the 6 of 6 category in a given draw, all money allocated for that category is "carried forward or 'rolled over' " to the prize pool for the next drawing.

not whether CSL, in its overall operations, complies with the Lottery Act by paying out approximately 50 percent of its revenues in prizes. CSL's argument proves too much, for were we to accept it we would be compelled to conclude *any gambling game* would become a lottery when operated by CSL. If CSL Keno is a lottery because a fixed 50 percent of its revenues is eventually paid out in prizes for some game, so would any other banking game be a lottery, so long as 50 percent of its revenue was eventually returned in prizes for one game or another.

To illustrate the flaw in CSL's logic, suppose the State of Nevada were, by statute, to require casinos to return approximately 75 percent of all gambling revenues in payouts to bettors. Would that law transform blackjack, roulette or other banking games played at the casinos into lotteries? No, because it would not alter the banked character of the games themselves. For the same reason, the Lottery Act's 50 percent requirement does not turn CSL Keno into a lottery.

CSL's argument thus loses sight of the fact that the voters, in Proposition 37, did not establish a state gambling house, but a state *lottery*. The voters authorized CSL to operate "Lottery Games," and gave that term a definition which, as CSL agrees, is materially equivalent to the traditional legal definition of a lottery contained in Penal Code section 319. We may not now interpret the Lottery Act as authority for CSL to conduct other forms of gambling.

CSL also notes that it is forbidden from receiving any appropriations or loans from state funds for the purpose of paying prizes. (Gov. Code, § 8880.3.) At oral argument, counsel for CSL argued that because of this limitation, CSL's prize fund could not be "broken," even in theory. In the highly unlikely event CSL's available funds for prizes were completely depleted by its operation of Keno, counsel suggested, CSL would comply with state law by paying winners prizes smaller than those provided for in the regulations.

We have no doubt that, should the statistically unimaginable somehow come to pass, CSL would find a legal way to extricate itself without attempting to draw on the state's General Fund. CSL might, for example, borrow money from a nongovernment source for a short period, or might briefly postpone payment of some prizes while additional revenues were accumulated. Assuming, arguendo, that CSL's legal alternatives would also include retroactive reduction of prizes already won, the existence of such an option would be legally irrelevant.

Were CSL legally protected in the manner asserted, it would remain true that, in every draw of CSL Keno, CSL has a stake in the outcome of the draw. As already shown, CSL, as banker, bets against each participant that the participant will not correctly guess the numbers to be drawn. The total amount CSL must pay out on each draw depends upon the outcome of the draw. This fundamental fact is not altered by the assertion that, should the payout be beyond CSL's available cash, it could legally be reduced to the amount available. To put the point in concrete, although entirely hypothetical, terms, suppose CSL's revenues on a given game of Keno were $100,000. Depending on which spots the numerous bettors chose to play, and on their success in guessing the drawn numbers, CSL might, in theory, have to pay out "prizes" totaling $3,000, $30,000, $300,000 or $3 million. This variability in payout is not altered by the asserted fact that the law may place some upper limit on it. If CSL were somehow limited to a $2 million payout because that was the extent of its cash on hand, for example, that fact would not eliminate the variability in payout that accompanies a banking game; it would only establish a legal maximum to the variability. CSL would still be betting against each of the other participants, but would be in the enviable position of a gambler who has, by law, an upper limit to his losses.

Finally, CSL, citing many of the same fundamental distinctions between lotteries and banking games we have discussed at length above, reasons that since CSL Keno is a lottery, it must not be a banking game. The problem with this syllogism, of course, is that the minor premise—that CSL Keno is a lottery—is false. Using the same major premise—that banking games and lotteries are mutually exclusive—we have reasoned in the opposite manner: we have concluded, as a matter of law, that CSL Keno is a banking game and, therefore, not a lottery.

CNIGA also contends CSL Keno is a lottery game authorized under the Lottery Act. CNIGA points to portions of the ballot pamphlet for Proposition 37, in which the voters were told that among the types of lottery games CSL might run were "Numbers Games," in which players try to match a group of randomly chosen numbers, and "games using . . . on-line computers, and instant game video terminals . . . ." (Ballot Pamp., *supra*, at pp. 46 [analysis by Legislative Analyst], 48 [argument in favor].) CNIGA is correct that CSL may conduct numbers games and on-line games. The games, however, must be lotteries, which CSL Keno is not. The feature that makes CSL Keno a banking game rather than a lottery is not that it is a numbers game or is played through a computer and video terminal, but that it offers fixed payoffs to a number of bettors determined by the draw, and that the operator therefore has a stake in the play of the game.

Finally, CNIGA contends that the voters, in Proposition 37, authorized CSL to conduct some banking games, and that CSL Keno's banked character thus does not disqualify it as a lottery game. In the ballot information on Proposition 37, CNIGA points out, the voters were told that among the common games run by state lotteries were " 'instant games,' in which a bettor purchases a lottery ticket and can immediately determine if he or she has won a prize by scratching off a coating on the ticket." (Ballot Pamp., *supra*, at p. 46 [analysis by Legislative Analyst].) ██ CSL operates a variety of such instant games, collectively called "Scratchers." CNIGA argues that Scratchers is a banking game, and that the voters thus evidently intended to authorize CSL to conduct some banking games.

If instant scratch-off games were necessarily banking games, CNIGA's argument might have some force, although it still would not prove the voters intended to authorize *other* banking games, such as Keno. We are not convinced, however, that instant scratch-off games are necessarily banked. Indeed, an instant scratch-off game is not a banking game, but a straightforward form of lottery, if it has the following characteristics: (1) all tickets are, when sold, either winning or losing tickets; nothing in the manner of "play," that is, determines whether the ticket buyer wins or loses; and (2) all tickets printed for the game are sold; the game does not end, that is, until all tickets have been sold. Under these conditions, the operator knows in advance of play how much revenue will be produced and how much will be paid out in prizes. The operator thus has no interest in who buys a winning ticket and who a losing ticket, and does not wager against any of the ticket buyers. Such a scheme would be a lottery, not a banking game.[9]

### Conclusion

██ The analysis above fully decides the dispute before us. Because CSL may conduct only lotteries, and because CSL Keno, as described in the regulations, is not a lottery, CSL is not authorized to conduct its Keno game. We therefore need not decide whether CSL Keno also involves the use of slot machines, as plaintiffs further contend. Nor need we decide whether, as CNIGA contends, the Lottery Act grants CSL a complete exemption from the antigaming provisions of chapter 10, so that it may conduct any authorized game whether or not the game is prohibited by Penal Code section 330, uses slot machines, or violates other statutes in chapter 10.

[9]We have no occasion here to determine whether any or all of CSL's Scratchers games meet these criteria; nor is the record before us adequate to decide that question. In addition, there may be other ways of operating an instant scratch-off game as a lottery. The point of our discussion is merely that an instant scratch-off game *may* be a lottery under the traditional legal definition in Penal Code section 319.

Our decision is limited. It is based upon the statutory restriction of CSL's authority to the operation of lotteries, and addresses only Keno as described in the current regulations. We express no opinion as to whether a restructured Keno game could be run as a lottery. The Lottery Act, it should also be noted, may be amended by a two-thirds vote of the Legislature in order to further its purposes, and has indeed been amended on more than one occasion. (Prop. 37, § 5; see, e.g., Stats. 1992, ch. 500, §§ 1-13; Stats. 1993, ch. 322, § 1; Stats. 1994, ch. 581, § 1.) We express no opinion, however, as to whether a statutory amendment permitting CSL to operate Keno or other banking games would be deemed to further the purposes of Proposition 37.

## DISPOSITION

The judgment of the Court of Appeal is reversed. The cause is transferred to the Court of Appeal with directions to reverse the superior court's judgment in favor of defendants and order the superior court to enter a new judgment in favor of plaintiffs.

George, C. J., Mosk, J., Kennard, J., Baxter, J., Chin, J., and Brown, J., concurred.