TO BE PUBLISHED IN THE OFFICIAL REPORTS

OFFICE OF THE ATTORNEY GENERAL
State of California

DANIEL E. LUNGREN
Attorney General

<table>
<tr><td></td><td>:</td><td></td></tr>
<tr><td>OPINION</td><td>:</td><td>No. 96-1003</td></tr>
<tr><td></td><td>:</td><td></td></tr>
<tr><td>of</td><td>:</td><td>December 31, 1998</td></tr>
<tr><td></td><td>:</td><td></td></tr>
<tr><td>DANIEL E. LUNGREN</td><td>:</td><td></td></tr>
<tr><td>Attorney General</td><td>:</td><td></td></tr>
<tr><td></td><td>:</td><td></td></tr>
<tr><td>GREGORY L. GONOT</td><td>:</td><td></td></tr>
<tr><td>Deputy Attorney General</td><td>:</td><td></td></tr>
<tr><td></td><td>:</td><td></td></tr>
</table>

THE CALIFORNIA STATE LOTTERY COMMISSION has requested an opinion on the following question:

Are the games of Super Lotto, Daily 3, Fantasy 5, and Scratchers, as conducted by the California State Lottery Commission, lottery games?

CONCLUSION

As conducted by the California State Lottery Commission, Super Lotto, with the exception of the Bonus 7 and Match 3-of-6 features, is a lottery game; Fantasy 5 is a lottery game; Scratchers is a lottery game; Daily 3 is an unlawful banking game.

ANALYSIS

The California State Lottery ("CSL") was established pursuant to the California State Lottery Act of 1984 (Gov. Code, §§ 8880-8880.68, "Act"),[1] an initiative measure approved by the voters on November 6, 1984. The purpose of CSL is to raise revenue for public education in California.[2] This revenue is raised by means of various lottery games conducted on a statewide basis by the CSL Commission ("Commission").

As authorized by section 8880.28, the Commission has promulgated regulations specifying the types of lottery games to be conducted as part of the CSL. One such game, Keno, was ruled by the Supreme Court in *Western Telcon, Inc.* v. *California State Lottery* (1996) 13 Cal.4th 475,[3] to be an illegal "banking game" rather than a "lottery game" (§ 8880.12) or a "lottery" (Pen. Code, § 319). We are asked whether certain other games conducted by the Commission are lotteries or illegal banking games under the *Western Telcon* analysis.

Before addressing the elements of each CSL game individually, we note that the creation of CSL involved not only electorate approval of the Act but also an amendment of the Constitution. "The Legislature has no power to authorize lotteries and shall prohibit the sale of lottery tickets in the State." (Cal. Const., art. IV, § 19, subd. (a).) To this prohibition, the 1984 initiative measure added a specific exception for CSL: "Notwithstanding subdivision (a), there is authorized the establishment of a California State Lottery." (Cal. Const., art. IV, § 19, subd. (d).) The voters also added a separate prohibition: "The Legislature has no power to authorize, and shall prohibit casinos of the type currently operating in Nevada and New Jersey." (Cal. Const., art IV, § 19, subd. (e).)

The initiative measure approved by the voters left unchanged those provisions of the Penal Code that define a lottery and that contain prohibitions on the operation of lotteries. (Pen. Code, §§ 319-329.) The Penal Code definition of a "lottery" is "any scheme for the disposal or distribution of property by chance, among persons who have paid or promised to pay any valuable consideration for the chance of obtaining such property or a

---

[1] All unidentified section references herein are to the Government Code.

[2] Under the terms of section 8880.4, at least 34 percent of the total annual revenues of CSL must be allocated to the benefit of public education. Fifty percent of the revenues is returned to the public in the form of prizes; no more than 16 percent of the revenues is allocated for the payment of expenses. Interest, surpluses, and unclaimed prize money are allocated to the benefit of public education.

[3] All unidentified page references herein are to *Western Telcon, Inc.* v. *California State Lottery*, *supra*, 13 Cal.4th 475.

portion of it . . . ."  (Pen. Code, § 319.)

The Act defines a "lottery game" as "any procedure authorized by the Commission whereby prizes are distributed among persons who have paid, or unconditionally agreed to pay, for tickets or shares which provide the opportunity to win such prizes."  (§ 8880.12.)  It also limits the types of lottery games the Commission may authorize.  "No lottery game may use the themes of bingo, roulette, dice, baccarat, blackjack, Lucky 7's, draw poker, slot machines, or dog racing."  (§ 8880.28, subd. (a)(1).)  "In games utilizing computer terminals or other devices, no coins or currency shall be dispensed to players from these computer terminals or devices."  (§ 8880.28, subd. (a)(3).)

Against this background of constitutional and statutory authority, the Supreme Court concluded that the Commission was conducting its Keno game[4] as a "banking game"

---

[4] The court described the operation of the game as follows:

"In CSL Keno, participants try to match between 1 and 10 numbers to a set of 20 numbers randomly selected, out of the integers 1 through 80, by a CSL computer.  The game is played approximately every five minutes at locations throughout California, known in the regulations as 'retailers,' which are equipped with CSL computer terminals and video display screens.

"The retailer provides the player with a 'playslip' with the numbers 1 through 80 on it.  The player first chooses and marks on the playslip *how many* numbers, from 1 to 10, he or she wishes to play.  This number, according to the regulations, is the 'spot.'  To play the '7 spot,' for example, is to select 7 numbers from the field of 1 to 80.  The player then selects the numbers to be played, and either places the playslip in the computer terminal or has an employee of the retailer do so.  After the gambler pays what is referred to in the regulations as a 'wager' of between $1 and $20, the terminal issues a ticket.  The ticket is the player's only valid receipt for claiming his or her winnings, if any.

"In the alternative, the player can allow the computer terminal to select one to ten numbers.  This is called 'Quick Pick.'  The gambler marks on the playslip the spot to be played and that he or she wishes to use the Quick Pick process.  The playslip is then inserted in the terminal, and the Quick Pick numbers are selected randomly by the computer, which issues the ticket.

"Approximately every five minutes, a central CSL computer randomly `draws' twenty numbers from the integers 1 through 80.  It is these 20 numbers that the bettor hopes match the selections on the ticket.  The 20 winning numbers are displayed on a video screen at the retailer location.

"Payoffs in CSL Keno are 'preset' according to a schedule in the regulations.  The payoff for a given wager depends only on the spot played and the number of numbers

rather than as a "lottery." Penal Code section 330 prohibits the playing of "any banking or percentage game played with cards, dice, or any device, for money, checks, credit, or other representative of value . . . ."

Initially, the court observed that although the Act does not contain a provision expressly prohibiting the Commission from conducting games other than lotteries, neither the language of the Act nor the official ballot material suggests the operation of any other types of games. It thus limited its analysis to determining whether CSL Keno was a lottery or an illegal banking game. (Pp. 483-484.)[5]

The court found that the Penal Code definition of a "lottery" was materially indistinguishable from the Act's definition of a "lottery game." (P. 484.) Recognizing the historic distinction between the operation of the lotteries and other forms of illegal gaming, the court focused on the "prize" element as the key to resolving the issues before it:

"While most California decisions on lotteries have concerned the elements of chance [citations] and consideration [citation], this case requires us to examine the nature of a 'prize.' More particularly, the case hinges on the distinction between a prize which is distributed to one or more of the contestants in a lottery, and a wager that is won or lost in bilateral betting on a game of chance. A parallel distinction is to be drawn between lotteries, in which the operator distributes the prize or prizes to the winner or winners, and

matched. On a $1 wager, the payoff may be as low as $1 (for the 4-spot/2-match category, among others) or as high as $250,000 (for the 10-spot/10-match category).

"In CSL Keno, a winner's payoff does not depend on the number of players participating in a particular draw, on the aggregate amount wagered on the draw by all players, or on how many other players made the same winning selection or other winning selections. The 'prizes' established for each winning category are not shared among all winners; instead, CSL pays a fixed payoff to each winner no matter how many winners are in a given draw. The regulations provide only one exception to the pre-set payoff schedule: the total payoff on the 10 spot/10 match category for a single draw is limited to $10 million; if the payoff, at a fixed rate of $250,000 for each winning $1 bet, would exceed that amount, 'each valid winner's share value for this category shall be calculated as a pari-mutuel prize for a prize pool of exactly $10,000,000.'

"Payoffs up to $599 may be collected from the retailer, while greater payoffs must be redeemed from a CSL office. The computer terminal itself does not pay out any money." (Pp. 480-481.)

[5] Our opinion is also limited to the question whether the specified games are lotteries or illegal banking games.

a banked gambling game, in which the operator pays off all winning wagers and keeps all losing wagers.

> "A lottery must involve distribution of one or more prizes, rather than mere bilateral wagering. 'A prize must be distinguished from a bet between two persons upon an uncertain future event.' (71 Ops.Cal.Atty.Gen. 139, 146 (1988).) When two parties wager against one another on the outcome of a game, they engage only in *gaming*. [Citation.] The bettors do not thereby conduct a lottery, for neither of them has offered up any property as a prize to be distributed to others." (P. 485.)

The court explained:

> "A wager between two parties may be won by either of them. Each of the two has a chance to win the stake of the other and retain his or her own stake; neither puts up any property to be disposed of or shared by *others* according to chance." (*Ibid.*)

In such a bilateral wager, each of the players has an interest in the outcome of the bet. By contrast, a lottery operator does not "wager" or hazard his property against that of others and is not a contender for the prize.

> Having drawn the basic distinction between a prize and a bilateral wager, the court discussed the type of wager which it ultimately found CSL Keno to be:

> ". . . When one party wagers simultaneously against a number of others on the outcome of a game, the scheme is a [sic] called a banked game or, in the words of our statute (§ 330), a 'banking game.' . . . As succinctly stated in *People* v. *Ambrose* (1953) 122 Cal.App.2d Supp. 966, 970, '[i]n a banking game the banker or exhibitor pays all the winnings and suffers all the losses; he is the one against the many, which is the supreme test of a banking game.'

> "Superficially, some banking games may resemble some forms of lottery. Many of the common devices for generating chance outcomes, such as numbered wheels, ball hoppers, playing cards and computer programs generating random numbers, can be used for lotteries as well as to run banking games. In both there is one operator; in both, typically, there are many participants. In both lotteries and banking games each of the participants may win or lose money depending on a chance outcome.

> "These two categories of gambling are nonetheless exclusive of one

another, and can be surely distinguished, not by the manner of play, but by *the nature of the betting itself*. [Citation.] In a lottery the operator does not bet against any of the participants, but merely offers up a prize for distribution to one or more of them. The operator, in other words, has no interest in the outcome of the chance event that determines the winner or winners—the 'game' or 'draw'—because neither the fact the prize will be disposed of, nor the value of the prize to be distributed, depends upon which, or how many, of the lottery entrants might win it. In a banking game, in contrast, the operator does compete with the other participants: 'he is the one against the many.' (*People* v. *Ambrose*, *supra*, 122 Cal.App.2d at p. Supp. 970.) The operator thus has a direct interest in the outcome of the game, because the amount of money the operator will have to pay out depends upon whether each of the individual bets is won or lost.

"One corollary of the distinction drawn above is that the operator of a banked game may or may not, depending on the outcome of the game, be obliged to pay out more than the amounts wagered on a particular game. Moreover, an extraordinary run of bad luck on the part of the house may unpredictably deplete its funds. A bank, in theory, can be 'broken.' A lottery can never be broken in this sense. True, if a lottery operator offers a fixed prize—a particular automobile or piece of real property, for example—the ticket receipts may be insufficient to cover the cost. But the operator's success or failure in such a lottery depends only on *how many* entries are attracted, not on *which participant, or how many participants*, win the prize. The outcome of the game or draw, in other words, does not determine whether the lottery operator makes or loses money on that game or draw." (Pp. 487-488; fn. omitted.)

Based upon the foregoing analysis of lotteries and banking games, the court had little difficulty in determining that CSL Keno was an illegal banking game:

"This scheme is clearly a banking game, with CSL acting as the bank, rather than a lottery. CSL is 'the one against the many, which is the supreme test of a banking game.' (*People* v. *Ambrose*, *supra*, 122 Cal.App.2d at p. Supp. 970.) After the draw, CSL pays off on all winning bets and collects all losing bets; CSL offers no prize for distribution to others, but simply bets individually against each of the other participants. As CSL itself notes, a *lottery* operator 'is not himself a contender for the prize.' But in CSL Keno, CSL does in fact 'contend' for each wager, since it has a chance to win each of the wagers placed by the players.

"Because of the preset payoff schedule, CSL has an interest in the outcome of each draw: depending on that outcome, it may have to pay off many large winners, few or none, and may retain many large losing wagers, few or none. Its financial success in each draw depends, theoretically, on the outcome of the game. The total amount of money paid out by CSL on a game of Keno is not, as in a lottery, either fixed in advance or determined by the total amount wagered; instead, it depends on the outcome of the draw–on how many players win the game and how many lose, as well as on which players win and which lose." (P. 489; fn. omitted.)

The court pointed out that CSL Keno did not involve the distribution of any *prize*, but only simultaneous bilateral wagering between CSL and the other participants. (P. 490.) The court agreed that a lottery may involve a fixed prize that is not based on the total amount wagered, but with the caveat that the total number of fixed prizes must be determined in advance of the draw. If that number is not predetermined, the operator's total payout will depend on the outcome of the game and the scheme becomes a banking game. (*Ibid*.)

The court noted that the Commission's revenues for a given game could be less than the total payout since the prize schedule was constructed so that "[a]s nearly as practical" 50 percent of total revenue would be paid in prizes. (§ 8880.63.) However, as the total payout depended on the outcome of the game, and thus may *in theory* exceed the total wagers, CSL Keno was simply "a banking game in which the payoffs have been adjusted to produce a house advantage of around 50 percent." (P. 491.) A lottery, on the other hand, can never fail financially as a result of the operator's bad luck in the draw. Any shortfall in a fixed prize lottery "results in no way from the outcome of the draw itself, but only from the insufficient number of tickets bought." (*Ibid*.)

The court found unpersuasive the argument that CSL Keno involved a "prize pool" whereby excess winnings could be rolled over for subsequent play. The rollover feature was "insufficient . . . to transform CSL Keno from a banking game into a lottery" because "[t]he question . . . is whether CSL operates *Keno* as a lottery, not whether CSL, in its overall operations, complies with the Lottery Act by paying out approximately 50 percent of its revenues in prizes." (Pp. 492-493.)

As for the argument that the Commission's prize fund could not be "broken," even in theory, the court observed that "[w]ere CSL legally protected in the manner asserted, it would remain true that, in every draw of CSL Keno, CSL has a stake in the outcome of the draw." (P. 494.) The total payout still depended upon the success of the participants in guessing the numbers to be drawn. The fact that the payout might be subject to some legal limit "would not eliminate the variability in payout that accompanies a banking game; it

would only establish a legal maximum to the variability." (*Ibid.*) The court thus concluded that "[b]ecause CSL may conduct only lotteries, and because CSL Keno, as described in the regulations, is not a lottery, CSL is not authorized to conduct its Keno game." (P. 495.)

In determining whether the games in question are lotteries or illegal banking games, we apply the guidelines set forth in the *Western Telcon* decision. These guidelines require that we ask two basic questions with respect to each game. First, is the game operated on the basis of a pari-mutuel system where the Commission offers a prize (determined by the total amount wagered) for distribution to one or more of the participants and has no stake in the outcome of the draw, or does the game put the Commission in the position of being "the one against the many" who has a stake in the outcome of the draw? Second, if a fixed prize is involved, is the maximum number of such prizes determined in advance of the draw? If the game is based on a pari-mutuel system, or if it offers a fixed prize and the maximum number of prizes is fixed in advance of the draw, it qualifies as a lottery.

1.      Super Lotto

"Lotto" is a generic name for a type of game known as a "number match game." The player selects a group of numbers from a larger field of numbers and wins by matching specific numbers which are subsequently drawn at random from the total field. In Super Lotto, as conducted by the Commission, players seek to match all six of the numbers drawn from a field consisting of the numbers one through fifty-one. The available prize pool is approximately 50 percent of the total sales for the draw period immediately preceding the drawing. The prize pool is allocated to four prize categories: (1) players picking all six winning numbers; (2) those picking any five of the winning numbers; (3) those picking any four of the winning numbers; and (4) those picking any three of the winning numbers. The sum allocated to a particular prize category remains the same regardless of how many winning selections occur within that category; multiple winning selections within a category split the prize allocated to that category. However, for administrative convenience, CSL has fixed the prize for successfully matching three of the six winning numbers at $5 notwithstanding the estimated pool allotment. Monies allocated to prize categories for which there is no winning selection in a given drawing are carried forward or "rolled over" to the subsequent drawing as part of the six-of-six category prize pool.

Leaving aside for the moment the fixed prize structure for the three-of-six category, we find that Super Lotto's prize pool is a prize offered for distribution to others and that its total payout is entirely dependent on the number of wagers placed. CSL does not keep the portion of the prize pool that has been allocated to a category for which there is no prize winner; that sum is rolled over to the next drawing. CSL is simply the stakeholder and has no interest in the outcome of any drawing; it is not "the one against the many." Super

Lotto can thus be said to "involve distribution of one or more prizes, rather than mere bilateral wagering." (P. 485.) Given these factors, the basic structure of Super Lotto qualifies as a "lottery."

However, there are two ancillary features of Super Lotto that must be analyzed separately because of their departure from the prize structure as outlined above. One feature is the three-of-six prize category in which winners are paid a fixed sum of $5 regardless of the size of the pool or the number of winners. The other feature, called "Bonus 7," is an additional way to win when the Super Lotto player purchases five Super Lotto plays on one ticket. A player making the requisite purchase receives, in addition to his five Lotto plays, a separate line on the Lotto ticket that displays seven numbers randomly selected by computer. If any six of those numbers match the six numbers actually drawn in Super Lotto, the player receives a prize of $200,000 from the jackpot reserve fund. This prize is derived from funds left after certain administrative procedures generate an excess in the prize pool reserve. If no one wins, the prize remains in the reserve fund until the next Bonus 7 draw. Bonus 7 play is suspended during those periods when the jackpot reserve fund is depleted.

As to the three-of-six feature, we find that it does not comport with the standards for a lottery set forth in *Western Telcon*. Referring to Super Lotto and another game involving a three-of-six match, the court in *Western Telcon* offered the following dictum: "In both these games, however, prizes for matching only three numbers are fixed; to this extent, therefore, the games may suffer from the same faults as the fixed prizes in CSL Keno." (P. 489, fn. 5.) The problem, however, is not that this feature involves a fixed prize; a lottery can be operated on the basis of a fixed prize as long as the *total* prize amount is established in advance of the draw. (P. 490.) If the *maximum number* of fixed prizes available in a draw is not determined in advance, the maximum amount to be awarded is indeterminate prior to the drawing, and CSL's maximum possible exposure for the three-of-six category will then depend entirely on the outcome of the game. Under these circumstances, CSL is in effect wagering against each participant that he or she will not correctly pick three out of six numbers.

As to the Bonus 7 feature, we do not believe that it may be treated as a "free" bonus, but rather it is offered as an inducement for the player to purchase more than four Super Lotto plays on one ticket. While the Bonus 7 feature may provide a convenient means of disbursing surpluses, it suffers from the same legal flaw of having fixed prizes whose number cannot be determined prior to the draw. The fact that the Bonus 7 feature is not implemented when the reserve fund becomes depleted does not negate the fact that, if the maximum total prize amount is not fixed in advance of the draw, CSL has a stake in the draw's outcome. Although monies that are not won by the players are left in the reserve fund

until the next draw, the banked character of the game is not changed.  (P. 493.)[6]

> 2.     Daily 3

Daily 3 is an on-line number-match game in which the player picks a set of three numbers, each being selected from a field of zero through nine.  The player next selects one of three playstyles:  straight, box, or straight/box.  A straight playstyle wins if the numbers selected by the player match the numbers drawn by CSL in the same order; a box playstyle wins if the three numbers chosen by the player match the three numbers drawn by CSL in any order; and a straight/box combination playstyle wins if the player's numbers match the numbers drawn by CSL in the same order or in any order.  All prizes are fixed prizes and range from $80 to $500, on a $1 wager, depending upon the playstyle selected.

The Daily 3 game has a built-in liability limit that allows CSL to restrict the ability of players to select a particular playstyle or combination of numbers.  If wagering on a certain set of numbers or playstyle reaches a preset maximum, no additional play will be allowed on that combination for that given draw.  This feature serves to minimize the possibility of "breaking the bank" in the game.  While the possibility of breaking the bank was discussed by the court in *Western Telcon* as a "corollary of the distinction" between a lottery and a banked game (p. 488), the fact that such a possibility could be minimized was not deemed sufficient by the court to preclude the game's status as a banking game.  As an example of why a built-in limit on CSL's liability would not prevent a game from being classified as a banking game, the court offered the following analysis of a statistical safeguard against breaking the bank:

> ". . . If CSL were somehow limited to a $2 million payout because that was the extent of its cash on hand, for example, that fact would not eliminate the variability in payout that accompanies a banking game; it would only establish a legal maximum to the variability.  CSL would still be betting against each of the other participants, but would be in the enviable position of a gambler who has, by law, an upper limit to his losses."  (P. 494.)

Here also there is a variability in payout that gives CSL a stake in the outcome notwithstanding the artificial liability limit.  Because a maximum number of possible winners is not a pre-established part of the game's architecture, CSL's participation in the game

---

[6] We are advised that during the pendency of this opinion, CSL has eliminated the Bonus 7 feature of Super Lotto and has altered the three-of-six feature so that the prize is awarded on a pari-mutuel basis with a $5 minimum prize.

prevents Daily 3 from qualifying as a lottery.[7]

### 3. Fantasy 5

Fantasy 5 is an on-line number-match game in which the player selects five numbers from among a set of numbers from one through thirty-nine. As with Super Lotto, a drawing is held by CSL to determine the winning numbers, the prize fund (50 percent of total sales) is allocated to three prize categories (five-of-five, four-of-five, and three-of-five), and all players with the same winning numbers share equally in the prize fund for their respective prize category. The match two-of-five category awards winners a free replay ticket for the next scheduled Fantasy 5 game drawing.[8] The free replay tickets do not affect the payout of the next game.

Ten percent of the total sales for each Fantasy 5 game provides prizes awarded as part of a "Big Spin" feature. Fantasy 5 players are selected in a random drawing by CSL to compete for additional prize money on the Big Spin television program. CSL limits the number of contestants to three and thereby prevents the total payout resulting from the Big Spin feature from exceeding the monies allotted for that purpose. Unlike the built-in liability limits of the Daily 3 game, CSL's control over the number of contestants selected for the Big Spin serves to eliminate the uncertainty of total possible payout that accompanies a banking game. Fantasy 5 contestants on the Big Spin program compete for prizes ranging from $10,000 to $150,000, and, although CSL has not established in advance the maximum possible payout for each monetary category (i.e., $10,000, $25,000, $50,000, etc.) will be on
that particular show, it can be sure that the three contestants will not win more than $450,000. Consequently, the Big Spin feature of the Fantasy 5 game does not prevent the game from qualifying as a lottery.[9]

---

[7] We are informed that CSL has adopted new regulations in which all Daily 3 prizes are pari-mutuel, qualifying the game as a lottery.

[8] All replay tickets are "Quick Pick" selections issued automatically by an on-line terminal at the time the original match two ticket is validated by the retailer.

[9] While there is uncertainty as to which of several prizes are won on the Big Spin, and therefore variability in the payout (*see* p. 494), there is, however (1) a maximum prize amount on the wheel and (2) a fixed number of players, thereby limiting the payout and the maximum possible monetary exposure. While variability in payout generally indicates a game that fails to meet the definition of a lottery, we believe that where the exposure is limited by the fixed number of players and maximum prize amounts, as in the Big Spin feature of the Fantasy 5 game, the concerns are adequately met that the game is a lottery within the meaning of *Western Telcon*.

4.      Scratchers

Scratchers is the name given to a variety of off-line "instant ticket games" in which players win prizes ranging from a free ticket to several thousand dollars. Certain Scratchers games include the possibility of being a participant on the Big Spin television program to compete for larger cash prizes.[10]

The court in *Western Telcon* analyzed several instant scratch-off games, specifically noting that "voters were told that among the common games run by state lotteries were ' "instant games," in which a bettor purchases a lottery ticket and can immediately determine if he or she has won a prize by scratching off a coating on the ticket.' (Ballot Pamp., *supra* , at p. 46 [analysis by Legislative Analyst].)" (P. 495.) The court concluded that an instant scratch-off game would qualify as a lottery under two conditions:

> ". . . an instant scratch-off game is not a banking game, but a straightforward form of lottery, if it has the following characteristics: (1) all tickets are, when sold, either winning or losing tickets; nothing in the manner of "play," that is, determines whether the ticket buyer wins or loses; and (2) all tickets printed for the game are sold; the game does not end, that is, until all tickets have been sold. Under these conditions, the operator knows in advance of play how much revenue will be produced and how much will be paid out in prizes. The operator thus has no interest in who buys a winning

---

[10] At present, two Scratchers games include the possibility of appearing on "The Big Spin." One of the Scratchers is called simply "Big Spin Scratcher." A player who uncovers the word "SPIN" three times on a Scratcher will be invited to be on "The Big Spin." The other possibility for getting on the program is to uncover three "TV SHOW" on the Scratcher. Persons in the latter group then are on the program, participating in what is called "The Winner's Circle." In this segment of the program, 10 people gather around a table and a ball is released on the table. The ball passes through differed gates, and eventually comes to rest before one of the players. The unsuccessful players receive $1,500. The other player gets to participate in the Big Spin itself.

The player spins a large, upright wheel, and a ball moves around the perimeter of the wheel, eventually coming to rest on a specified dollar amount, the word "Double" or the word "Decision." Double means the player spins again, and gets double the amount indicated. Decision means the player can take $50,000, or spin again. Prizes range from $20,000 to $1,000,000; any prize can be doubled by the Double Spin result.

The other game that can result in a player being on the show is the Wizard of Odds Scratcher. A player who uncovers three crystal ball symbols will be on the show. Each show participant pushes a button that causes one ball, from a container in which 100 balls are tumbling, to fall into a holder. Each ball bears a symbol, which adds to or subtracts from the players potential award. The most a player can win is $50,000; the least is $4,000.

ticket and who a losing ticket, and does not wager against any of the ticket buyers. Such a scheme would be a lottery, not a banking game." (*Ibid*., fn. omitted.)

Applying the court's criteria to the Scratchers games conducted by CSL, we find that the first condition is met since the manner of "play" does not determine whether the ticket buyer wins or loses. Each ticket is a winning or losing ticket when sold. As for the second criterion, CSL conducts the games so that, to the extent reasonably possible, all tickets printed for the game are sold; each game does not end until all tickets have been sold. CSL thus knows in advance of play how much revenue will be produced and how much will be paid out in prizes. Accordingly, CSL does not have an interest in who buys a winning ticket and does not wager against the ticket buyers. Scratchers is a legal lottery.

As with the Big Spin feature of Fantasy 5, the Big Spin feature of Scratchers involves a limited number of contestants and maximum prize amounts. The Big Spin feature therefore does not prevent Scratchers from qualifying as a lottery.[11]

\* \* \* \* \*

---

[11] See footnote 9, supra.