Filed 6/25/15

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE ex rel. LINDA GREEN, as DISTRICT ATTORNEY, etc., | ) ) ) | S217896, S217979 |
| Plaintiff and Respondent, | ) ) | |
| v. | ) ) | Ct.App. 5 F065450 |
| KIRNPAL GREWAL, | ) ) | Kern County |
| Defendant and Appellant. | ) ) ) | Super. Ct. Nos. CV-276959, CV-276958, CV-276961, CV-276603, CV-276962 |
| [And four other cases.*] | ) ) | (Consolidated) |

Slot machines, sometimes called "one-armed bandits" (although younger users might wonder why), have long been outlawed in California. Under review are devices that resemble traditional casino-style slot machines in some ways and offer users the chance to win sweepstakes prizes. Because they employ modern technology, the devices differ from traditional slot machines in some ways. We must decide whether the devices come within the statutory definition of a "slot

_____

\* *People ex rel. Green v. Walker* (No. F065451); *People ex rel. Green v. Stidman* (No. F065689); *People ex rel. Green v. Nasser* (No. F066645); *People ex rel. Green v. Elmalih* (No. F066646).

machine or device" in Penal Code section 330b.[1] We conclude they do and affirm the judgments of the Court of Appeal, which reached the same conclusion.

## I. FACTS AND PROCEDURAL HISTORY

These facts are taken largely from the Court of Appeal opinions authored by Justice Kane.

In these cases, which we have consolidated for argument and this opinion, the People of the State of California, by and through the District Attorney of Kern County, filed civil actions against defendants Kirnpal Grewal, John C. Stidman, Phillip Ernest Walker, Kamal Kenny Nasser, and Ghassan Elmalih, operators of Internet cafés in Kern County. Three distinct, albeit similar, devices operated at several Internet café businesses are at issue here. We will first describe the businesses and devices as they existed at the time of the hearings in the superior court, then the procedural background.

### A. The A to Z Café; the OZ Internet Café and Hub

Defendant Kirnpal Grewal owned the A to Z Café, and defendant Phillip Ernest Walker owned the OZ Internet Café and Hub (the OZ), both in Bakersfield. The record shows, and the parties agree, that Grewal's business operated a sweepstakes system essentially identical to that of the OZ. Accordingly, we will discuss the OZ's system.

Among other products, the OZ sold computer and Internet time (hereafter, Internet time) on computer terminals on its premises. The OZ promoted the sale of Internet time and other products with a sweepstakes giveaway implemented

---

[1] All further statutory citations will be to the Penal Code unless otherwise indicated. As will be seen, section 330b refers to a "slot machine or device." However, we will sometimes refer to what the section proscribes as simply a slot machine.

2

through a software system that a company known as Figure Eight Software provided. Participants in the sweepstakes had the chance to win cash prizes varying from small amounts to a top prize of $10,000 as set forth in the sweepstakes' odds tables.

OZ customers could purchase Internet time for $10 per hour. When a customer purchased Internet time, an employee assigned the customer a personal identification number (PIN). The employee created an account by which the customer could access the computers and Internet as well as play sweepstakes computer games. Customers were not charged for Internet time while they were playing the computer sweepstakes games. At the time of purchase, the customer received 100 "sweepstakes points" for each dollar spent. Walker stated that "[c]ustomers purchase product[s] consisting mostly of computer and Internet time at competitive prices and receive free sweepstake points in addition to the product purchased." Additionally, a customer might receive 100 free sweepstakes points every day that the customer came into the OZ, and first-time customers received 500 additional sweepstakes points. These sweepstakes points could be "used to draw the next available sequential entry from a sweepstake contest pool." This could be done and the result revealed in one of three ways: (1) asking an OZ employee to reveal a result, (2) pushing an instant reveal button at the computer station, or (3) playing computer sweepstakes games at the computer terminals that appeared similar to common games of chance.

The sweepstakes rules provided that no purchase was necessary to enter the sweepstakes. According to Walker, noncustomers could obtain free sweepstakes entries by asking an employee at the OZ or by mailing in a request.

According to Walker, to access the computers, customers had to sign a "Computer Time Purchase Agreement" form. On the form, the customers had to acknowledge that they understood the following matters before using the OZ

3

computers: (1) that they were purchasing computer time and (2) the sweepstakes computer games were "not gambling," but were a "promotional game" in which all winners were predetermined. On the form, the customers affirmed that they understood "[t]he games have no [e]ffect on the outcome of the prizes won," but were merely an "entertaining way to reveal [their] prizes and [they] could have them instantly revealed and would have the same result."

Walker's declaration explained what happened when a customer used the sweepstakes computer game: "If a customer utilizes the pseudo-interactive entertaining reveal interface the customer can encounter some games that have appearances similar to common games of chance." However, before any "spinning wheels or cards" appeared on the screen, "the sweepstakes entry has already been drawn sequentially from a pool of entries and is predetermined. There is no random component to the apparent action of the images in the interface even though it simulates interactivity. Instead, the images will display a result that matches the amount of any prize revealed in the entries. [Citation.] [¶] As told to the customer in the rules and in disclaimers, the pseudo-interactive interface does not 'automatically' or 'randomly' utilize any play to obtain a result."

Walker also described in greater detail the operation of the software system the OZ used to run the sweepstakes. His declaration stated that under that software system, the issue of whether customers had won a cash prize was determined when their entries were drawn from a sweepstakes pool. Each such entry had a previously assigned cash prize of zero or greater. Entries were drawn sequentially from one of 32 sweepstakes pools (also called "multiple finite deals of entries") that the software company created. The software company prearranged the entries in each pool in a set order or sequence, and the OZ had no control over that order or sequence or the corresponding results. Access to a

4

particular sweepstakes pool was determined by how many points customers chose to use (or bet) at any one time. Each pool had its own prizes and its own separate sequence of entry results. When customers selected a sweepstakes pool, the software system assigned them the next available entry result in that pool, in sequence. At that point, the result was established and could not be affected by the computer game play, which merely revealed the established result. Walker stated that a specific sequential entry would yield the same result regardless of the method the customers used to draw and reveal it.

### B. I Zone Internet Café

Defendant John C. Stidman owned the I Zone Internet Café (I Zone) in Bakersfield. Among other products, I Zone sold Internet time to the public for $20 per hour, which customers could use on computer terminals located on the I Zone premises. To promote the sale of Internet time and its other products, I Zone offered a sweepstakes to customers when they made a purchase. Noncustomers might also enter the sweepstakes; that is, no purchase was necessary to enter. To enter a sweepstakes without purchasing Internet time or other products, a person could receive up to four free entries from the cashier each day on request. Four additional entries were available by mailing a form with a self-addressed, stamped envelope. A company known as Capital Bingo provided a computer software system that effectuated the sweepstakes.

Under the software system, a purchaser of Internet time or other products at I Zone received sweepstakes points for each dollar spent. A customer also received sweepstakes points for the first purchase of the day and for being a new customer. The customer received a white plastic card with a magnetic strip, which an I Zone employee activated at the register. A customer swiping the card at an open computer terminal was given the option of using the Internet function or

playing sweepstakes computer games. If the customer chose the games, the time playing them did not reduce the Internet time available. Both options were touch-screen operated and did not require a keyboard or mouse.

In playing the sweepstakes computer games, I Zone customers used their sweepstakes points in selected increments (simulating bets) on games with names such as Buck Lucky, Tropical Treasures, or Baby Bucks. According to the I Zone sweepstakes rules, each increment level available for play "represents a separate sweepstakes." Gambling-themed games resembling slot machines were prominently displayed on the I Zone terminals. According to a detective investigating the business, "[i]t appeared the subjects were playing casino-style slot machine games on the computers. . . . The audible sounds were that of casino-style slot machines." The detective noted that on one occasion, no one was on the Internet, but instead "all the people using the computer terminals were playing the sweepstakes games." Participants in the sweepstakes had a chance to win cash prizes ranging from small amounts to a top prize of $3,000.

In contending the sweepstakes games were not slot machines, Stidman presented evidence and argument regarding how they functioned. His position was that the computer sweepstakes games were merely an entertaining way for customers to reveal a sweepstakes result. A customer could also reveal a sweepstakes result by other means, such as by using a special function on the computer terminal or by asking an I Zone employee at the register to print out a result on paper. As Stidman described it, "[e]ach time a customer reveals the results of a sweepstakes entry, [regardless of the means used], the next available sweepstakes entry in the 'stack' is revealed," in sequence, from a prearranged stack of entries. The "next available sweepstakes entry" contains a predetermined result that would be the same regardless of which method was used to reveal it. Thus, when the customer engaged the sweepstakes computer games, the outcome

6

was determined by the particular sweepstakes entry that was being revealed at that time, not by the workings of the game itself. That is, the game simply revealed the predetermined result of the next sequential sweepstakes entry.

Stidman provided further documentary evidence of how I Zone's software system conducted the sweepstakes. This evidence indicated there were three distinct servers: (1) the "Management Terminal," (2) the "Point of Sale Terminal," and (3) the "Internet Terminal." As Stidman's counsel summarized in the trial court, "It is at the Management Terminal where all sweepstakes entries are produced and arranged. Each batch of sweepstakes entries has a finite number of entries and a finite number of winners and losers. Once a batch of sweepstakes entries is produced at the Management Terminal, it is 'stacked' . . . and then transferred to the Point of Sale Terminal in exactly the same order as when it left the Management Terminal. Each time a customer reveals the results of a sweepstakes entry, either at the Internet Terminal or at the Point of Sale, the next available sweepstakes entry in the 'stack' is revealed. In other words, the Internet Terminal simply acts as a reader and displays the results of the next sequential sweepstakes entry in the stack as it was originally arranged and transferred from the Management Terminal — it is never the object of play. In fact, exactly the same results [are displayed] for a specified sweepstakes entry whether the customer chooses to have the results displayed in paper format at the Point of Sale Terminal or in electronic format at an Internet Terminal." Stidman's evidence indicated that neither the Point of Sale Terminal nor the Internet Terminal had a random number generator and could not be "the object of play," since those servers could not influence or alter the result of a particular sweepstakes entry, but merely displayed that result.

7

### C. Fun Zone Internet Café; Happy Land

Defendant Kamal Kenny Nasser owned stores called the Fun Zone Internet Café, and defendant Ghassan Elmalih owned a store called Happy Land. The stores sold, among other things, Tel-Connect and Inter-Connect prepaid telephone cards. Defendants Nasser and Elmalih promoted the sale of telephone cards at their stores by offering sweepstakes to their customers. Phone-Sweeps, LLC (Phone-Sweeps), a company based near Toronto, Canada, furnished the Tel-Connect and Inter-Connect telephone cards. Phone-Sweeps also provided the computer software system that operated defendants' sweepstakes programs, including the computer sweepstakes games.

When customers purchased telephone cards or more time on their existing cards, they received 100 sweepstakes points for each dollar spent on prepaid telephone time. Thus, a customer purchasing $20 in telephone time would receive 2,000 sweepstakes points with the purchase. Noncustomers could receive sweepstakes points; that is, no purchase was necessary to enter. Persons over the age of 18 who entered defendants' stores could receive 100 free sweepstakes entries or points for that day. Additionally, free points could be received by mailing in a request form.

Customers could use their points by playing sweepstakes computer games on the terminals provided on the premises. Time spent on the terminals playing the computer sweepstakes games did not reduce the customers' available telephone time. Initially, customers gained access to the computer sweepstakes games by swiping their telephone card into an electronic card reader at the computer terminal. More recently, customers manually entered the account number shown on the back of the telephone card at the terminal keyboard.

Once the computer sweepstakes games were displayed, the customer was presented with a number of slot machine-style games activated by a touch screen.

8

The customers selected, based on available increments (such as 25, 50, or 100), how many points to use at one time. The customer either lost the points played, or was awarded additional points (called "winning points"), which the system tracked and displayed on the screen. If the customer finished with a positive number of winning points, the points were redeemable at one dollar per 100 points at the register. For example, 2,400 winning points would result in a cash prize of $24. According to an odds table, within each pool of entries there were entry results that ranged from $0.01 to $4,200 (based on redeemable points won). Customers not wishing to play the sweepstakes games could ask the cashier to do a "Quick Redeem" at the register to reveal an immediate result.

The system used to operate the sweepstakes program and computer sweepstakes games was an integrated system that formed a network of computers and servers. The main Phone-Sweeps server was located in Canada and was electronically connected to the servers in Nasser's and Elmalih's places of business. The server used in each place of business was, in turn, electronically connected to each of the numerous computer terminals that the customers used at that place of business to play the computer sweepstakes games.

Each sweepstakes consisted of a finite pool or batch of entries. Depending on the size of the retail store, the number of entries in a sweepstakes pool could be as high as 65 million. The Phone-Sweeps main server in Canada created the pools. The main server randomized the entries in each pool, put them into a set sequential order, and then delivered the pool in that sequential order to the "Point of Sale" computer (or server) in the stores. Neither Nasser nor Elmalih, nor their customers could change the sequence or contents (i.e., results) of the entries. The main server in Canada could detect when the pool in any particular store was nearing the end, and then it created a new pool, in the same manner, and delivered it to the Point of Sale computer (or server).

Customers playing the computer sweepstakes games simply received and obtained the results of the next available entry or entries, in sequence. Thus, the outcomes were predetermined by sequential entries, not by how the customers played the games. Customers could not impact the result that was determined by the next available entry. Additionally, neither the sweepstakes servers (i.e., the Point of Sale computers) nor the terminals where the computer sweepstakes games were played contained a random number generator or any other way to randomize or alter the sequence of the entry results.

There was evidence that over a one-year period, customers actually used 31 to 32 percent of the total telephone time that Phone-Sweeps sold through its licensees.

### D. Procedural Background

In May and June 2012, the Kern County District Attorney's Office filed on behalf of the People separate civil actions against each of the five defendants. The complaints alleged that the defendants had violated antigambling provisions of the Penal Code in operating their respective businesses and sought injunctive and other relief under Business and Professions Code section 17200. The pleadings cited provisions relating to unlawful lotteries (§ 319) and unlawful slot machines or gambling devices (§§ 330a, 330b, 330.1). The superior court held evidentiary hearings on the People's motions for preliminary injunctions. It granted preliminary injunctions prohibiting each defendant, pending further order of the court, "from operating any business that includes any type of 'sweepstakes,' 'slot machines,' or 'lottery' feature." It entered formal written orders granting the preliminary injunctions against Grewal, Stidman, and Walker on August 1, 2012, and against Nasser and Elmalih on November 26, 2012.

Each defendant appealed separately from the preliminary injunction. The Court of Appeal consolidated the appeals of Grewal, Stidman, and Walker, and, separately, the appeals of Nasser and Elmalih. In two separate opinions, the Court of Appeal affirmed the trial court orders. In each matter, it found the sweepstakes operations were illegal slot machines under section 330b. We granted each of the defendants' petitions for review. After the briefing was complete, we consolidated the two appeals for purposes of oral argument and opinion.

## II. DISCUSSION

The sweepstakes operations at issue here were similar to each other, although they varied in some respects. In each instance, the business sold a product (either Internet time or telephone cards) and, along with the product, provided the opportunity to play sweepstakes games, with the possibility of winning substantial cash prizes. Customers could also receive a limited number of free sweepstakes entries per day or could receive more by mailing in a request form. The customer had the option of either obtaining an instant sweepstakes result or playing games at a computer terminal to reveal the result. To begin playing the sweepstakes games, the customer would swipe a magnetic card or enter a number at a computer terminal. Those choosing to play the games had a choice of games resembling slot machines or casino-style games. The sweepstakes operation was an integrated whole, with an outside company supplying the software to operate the game. The outside company's software, which was connected to the computer terminals at the business, predetermined the result of each game. Neither employees at the business nor the customers themselves had any control over the outcome. The games themselves merely revealed the predetermined result; they had no influence on that result.

The district attorney alleged that each of the sweepstakes operations violated several antigambling provisions, including three that concern slot

11

machines. (§§ 330a, 330b, 330.1.) The definitions of slot machines in these provisions are similar but not identical. (*Hotel Employees & Restaurant Employees Internat. Union v. Davis.* (1999) 21 Cal.4th 585, 593-594; *People ex rel. Lockyer v. Pacific Gaming Technologies* (2000) 82 Cal.App.4th 699, 703, fn. 6 (*Pacific Gaming Technologies*).) The Court of Appeal focused on section 330b, finding it "[a]rguably the broadest of the three." It found that the operations at issue here were illegal slot machines under that section. Defendants challenge that finding in this court. Accordingly, the only provision before us on review is section 330b, and we will also focus on that section.

Section 330b, subdivision (a), makes it unlawful to possess "any slot machine or device, as defined in this section."[2] Subdivision (d) of that section provides the definition: "For purposes of this section, 'slot machine or device' means a machine, apparatus, or device that is adapted, or may readily be converted, for use in a way that, as a result of the insertion of any piece of money or coin or other object, or by any other means, the machine or device is caused to operate or may be operated, and by reason of any element of hazard or chance or

---

[2] In its entirety, section 330b, subdivision (a), provides: "It is unlawful for any person to manufacture, repair, own, store, possess, sell, rent, lease, let on shares, lend or give away, transport, or expose for sale or lease, or to offer to repair, sell, rent, lease, let on shares, lend or give away, or permit the operation, placement, maintenance, or keeping of, in any place, room, space, or building owned, leased, or occupied, managed, or controlled by that person, any slot machine or device, as defined in this section.

"It is unlawful for any person to make or to permit the making of an agreement with another person regarding any slot machine or device, by which the user of the slot machine or device, as a result of the element of hazard or chance or other unpredictable outcome, may become entitled to receive money, credit, allowance, or other thing of value or additional chance or right to use the slot machine or device, or to receive any check, slug, token, or memorandum entitling the holder to receive money, credit, allowance, or other thing of value."

12

of other outcome of operation unpredictable to him or her, the user may receive or become entitled to receive any piece of money, credit, allowance, or thing of value, or additional chance or right to use the slot machine or device, or any check, slug, token, or memorandum, whether of value or otherwise, which may be exchanged for any money, credit, allowance, or thing of value, or which may be given in trade, irrespective of whether it may, apart from any element of hazard or chance or unpredictable outcome of operation, also sell, deliver, or present some merchandise, indication of weight, entertainment, or other thing of value."
(§ 330b, subd. (d).)

We must decide whether the defendants' sweepstakes operations come within this definition. We are not the first court to grapple with this definition in recent years. Numerous courts have found devices similar to the ones here to be slot machines under this definition.

As the Court of Appeal summarized in *Grewal* below: "California courts have found section 330b to prohibit a variety of devices where prizes may be won based on chance. In *People ex rel. Lockyer v. Pacific Gaming Technologies*, *supra*, 82 Cal.App.4th 699, a vending machine that dispensed telephone cards for $1 included a 'sweepstakes' feature with audio-visual displays resembling a slot machine. When customers purchased a phone card for $1, they were given a chance to win a cash prize of up to $100. A 'preset computer program' determined the results. (*Id*. at pp. 701-702.) The Court of Appeal held the vending machine was a prohibited slot machine under the plain language of section 330b, because '[b]y the insertion of money and purely by chance (without any skill whatsoever), the user may receive or become entitled to receive money.' (*Pacific Gaming Technologies*, at p. 703.) Similarly, in *Trinkle v. Stroh* [(1997)] 60 Cal.App.4th 771, a jukebox that dispensed four songs for $1 was found to be a prohibited slot machine or device under section 330b because the operators also

13

received a chance to win a cash jackpot.  (*Id*. at pp. 779-781; see *Score Family Fun Center, Inc. v. County of San Diego* (1990) 225 Cal.App.3d 1217, 1221-1223 [holding that an arcade video game that simulated card games violated § 330b because operators could, as a matter of chance, win free games or extended play].)"

A recent federal case applying California law to an Internet sweepstakes game provides another example.  (*Lucky Bob's Internet Café , LLC v. California Department of Justice* (S.D. Cal., May 1, 2013, No. 11-CV-148 BEN (JMA)) 2013 U.S. Dist. LEXIS 62470, 2013 WL 1849270 (*Lucky Bob's*).))  *Lucky Bob*'s facts were similar to those of this case in many respects.

As the *Lucky Bob's* court described it, "Customers were given 100 entries to the Sweepstakes for every $1 of purchased internet time.  [Citation.]  In addition, each customer was entitled to 100 free entries for every 24-hour period.  [Citation.]  Customers were also able to mail a request for $1 worth of sweepstakes entries to World Touch Gaming, but this option was never used.  [Citation.]  [¶]  Purchased internet time was loaded onto a player card, which the customer swiped into an electronic card reader located at an assigned computer terminal.  [Citation.]  The user would then select a method for revealing his winnings from the monitor located at the terminal.  First, a customer could immediately reveal whether he won a prize.  [Citation.]  Second, a customer could play one of the seventeen casino-style games, then reveal whether he had won a prize at the end of the game.  [Citation.]  Many of these casino-style games are commonly associated with slot machines.  [Citation.]  [¶]  Plaintiffs' equipment operated a sweepstakes gaming system that was manufactured and licensed by World Touch Gaming, Inc.  [Citation.]  The World Touch Gaming system predetermined prize outcomes based upon chance as set forth in predefined odds tables for the gaming system, prior to when customers revealed their game entries

14

on player terminals.  [Citation.]  Based upon the odds tables, a game's overall financial outcome would be set at the time the pool of outcomes was generated.  [Citation.]  The system would then sequentially assign entries to patrons from the pool.  [Citation.]  Playing the casino-type games could not change the game entries' prize values." (*Lucky Bob's*, *supra*, 2013 U.S. Dist. LEXIS 62470 at pp. *2-*3, 2013 WL 1849270, at p. *1.)

The cash prizes in *Lucky Bob's* ranged from 10 cents to $3,000.  The players did not use most of the Internet time they purchased.  "At Lucky Bob's, a total of $1,225,055 was spent for 204,176 hours of internet time and 97.375% of the total purchased internet time was unused." (*Lucky Bob's*, *supra*, 2013 U.S. Dist. LEXIS 62470 at p. *3, 2013 WL 1849270, at p. *2.)

Relying heavily on *Pacific Gaming Technologies*, *supra*, 82 Cal.App.4th 699, the *Lucky Bob's* court found the device at issue to be an illegal slot machine under section 330b.  (*Lucky Bob's*, *supra*, 2013 U.S. Dist. LEXIS 62470 at pp. *6-*10, 2013 WL 1849270, at pp. *2-*4.)

In finding the devices at issue here to be slot machines, the Court of Appeal relied primarily on section 330b, subdivision (d)'s plain language.  Doing so was appropriate, because the language the Legislature chooses best indicates its intent.  (*People v. Cook* (2015) 60 Cal.4th 922, 935.)  We agree with the Court of Appeal's application of the statutory language to the facts.

As the Court of Appeal discussed in the *Grewal* opinion, "The first element specified in the statute is that '*as a result of the insertion of any piece of money or coin or other object, or by any other means, the machine or device is caused to operate or may be operated . . . .*' (§ 330b, subd. (d), italics added.)  Defendants argue that this element is lacking because no coin or similar object was inserted into a slot by customers at the computer terminal to cause the sweepstakes computer games to operate.  We reject that argument.  Here, the insertion of a PIN

15

[or, in *Nasser*, an account number] or the swiping of a magnetic card at the computer terminal in order to activate or access the sweepstakes games and thereby use points received upon paying money at the register (ostensibly to purchase a product) plainly came within the broad scope of the statute. The statute expressly includes the catchall phrase '*by any other means*.' (§ 300b, subd. (d), italics added.) Even though a coin, money or object (e.g., a token) was not inserted into a slot, the games were commenced *by other means* analogous thereto which effectively accomplished the same result and, therefore, this element is satisfied.

"The second element of a 'slot machine or device' articulated in section 330b is that '*by reason of any element of hazard or chance or of other outcome of operation unpredictable by him or her, the user may receive or become entitled to receive any . . . money . . . or thing of value . . . .*' (§ 330b, subd. (d), italics added.) This language describes the so-called chance element — that is, the requirement that any potential to win a prize must be based on hazard, chance or other outcome of operation unpredictable to the user of the machine or device.

"Here, it is clear that defendants' customers may become entitled to win prizes under the software systems implementing defendants' computer sweepstakes games based on 'hazard or chance or of other outcome of operation unpredictable' to the user. (§ 330b, subd. (d).) That is, we agree with the People that the chance element is satisfied. Under California gambling law, ' "[c]hance" ' means that 'winning and losing depend on luck and fortune rather than, or at least more than, judgment and skill.' (*Hotel Employees & Restaurant Employees Internat. Union v. Davis*, *supra*, 21 Cal.4th at p. 592.) Since customers playing defendants' computer sweepstakes games can exert no influence over the outcome of their sweepstakes entries by means of skill, judgment or how well they play the

16

game, it follows that we are dealing with systems that are based on chance or luck." (Fn. omitted.)

In arguing their devices are not slot machines, defendants rely primarily on *Trinkle v. California State Lottery* (2003) 105 Cal.App.4th 1401 (*State Lottery*). That case involved a claim that the California State Lottery's "use of electronic vending machines to dispense SCRATCHERS lottery tickets is an illegal use of slot machines." (*Id*. at p. 1403.) The game of Scratchers is a lottery that the California State Lottery is specifically permitted to operate. (See *Western Telcon, Inc. v. California State Lottery* (1996) 13 Cal.4th 475, 481-482, 495.) The California State Lottery sells the Scratchers lottery tickets in stores, sometimes using vending machines to do so. (*State Lottery*, at pp. 1403-1405.)

The Court of Appeal in *State Lottery*, *supra*, 105 Cal.App.4th 1401, reached what the Court of Appeal in *Grewal* aptly described as the "unsurprising conclusion that a vending machine that simply dispenses California State Lottery tickets in the sequential order that they were loaded into the machine is not an unlawful slot machine." That conclusion was undoubtedly correct. The tickets themselves were part of a lottery, itself a game of chance. But the California State Lottery is permitted to operate the lottery. Selling the tickets in vending machines, rather than from a sales clerk behind a counter, did not make the process an additional game of chance.

The Legislature has specifically authorized the California State Lottery to dispense lottery tickets in vending machines. (Gov. Code, § 8880.335.) That section, however, authorizes using vending machines only if "neither the operation or functioning of the ticket dispenser nor the operation or functioning of any component, subcomponent, part, chip, or program of the ticket dispenser, *or of any device in direct or indirect communication with the ticket dispenser*, may affect the probability that a ticket that is dispensed will have a prize value other than a

17

null prize value." (*Id.*, subd. (b), italics added.)  In other words, the Legislature authorized lottery ticket vending machines, but not machines integrated into a system that, taken as a whole, operates to determine winners and losers. Defendants here are doing something beyond what the California State Lottery is permitted.

Thus, *State Lottery*, *supra*, 105 Cal.App.4th 1401, is distinguishable from this case.  Defendants, however, latch onto certain language in *State Lottery* that, they argue, makes their devices lawful.  The *State Lottery* court described one of the statutory elements as being that "the operation of the machine is unpredictable *and* governed by chance . . . ." (*State Lottery*, at p. 1410, italics added.)  It is unclear how significant the point is to this case, but as the Court of Appeal in *Grewal* noted, "section 330b, subdivision (d), refers to *chance* 'or' *unpredictable* outcome."  "[U]se of the word 'or' in a statute indicates an intention to use it disjunctively so as to designate alternative or separate categories." (*White v. County of Sacramento* (1982) 31 Cal.3d 676, 680.)

More significantly, *State Lottery* has language indicating that, for a device to be a slot machine, the machine the customers operate must itself generate the element of chance at the time of operation, somewhat like the spinning wheels of the original mechanical slot machines. (*State Lottery*, *supra*, 105 Cal.App.4th at pp. 1411-1412.)  Defendants argue that their devices are not slot machines because the machines the customers operate to obtain the result do not themselves generate the element of chance at the time of operation.  The element of chance has already been generated, and customers playing the games merely receive the next result in a previously arranged, sequential order.

The Court of Appeal in *Grewal* disagreed with the suggestion (unnecessary to *State Lottery*'s holding) that the computer terminal which customers use to play the sweepstakes games must itself generate the chance or unpredictable outcome

18

at the time the customer plays the game. "Section 330b only requires that prizes may be won 'by reason of any element of hazard or chance or of other outcome of operation unpredictable by him or her . . . .' (§ 330b, subd. (d).) Under this broad wording, if the entries are arranged in a particular order beforehand, rather than rearranged each time the game is played, it will still suffice. Either way, the next sequential entry/result that is dealt out by the software system will be, from the perspective of the player, by 'chance or of other outcome of operation unpredictable by him or her . . . .' (*Ibid*.) [¶] . . . The mere fact that winnings are based on a predetermined sequence of results programmed into the software system, rather than on a randomly spinning wheel (or the like), does not change the nature and character of devices herein, which as integrated systems function as slot machines." (Fns. omitted.)

The Court of Appeal "treat[ed] each defendant's complex of networked terminals, software gaming programs and computer servers as a single, integrated system. Under section 330b, subdivision (d), an unlawful ' "slot machine or device" ' is not limited to an isolated or stand-alone piece of physical hardware, but broadly includes 'a machine, *apparatus*, or device that is *adapted*' for use as a slot machine or device. (Italics added.) As defined in dictionaries, the ordinary meaning for the term 'apparatus' includes 'a group or combination of instruments, machinery, tools, or materials having a particular function' (Random House Webster's College Dict. (1992) p. 66), as well as '[t]he totality of means by which a designated function is performed or a specific task executed' (Webster's II New College Dict. (2005 (3d ed.) p. 54). Here, each defendant's system of gaming software, servers and computer terminals plainly operated together as a single apparatus. (§ 330b, subd. (d).) While it is true that the end terminals or computer monitors used by patrons — if considered in isolation — may not intrinsically or standing alone contain all the elements of a slot machine, in each case they are part

19

of an integrated system or apparatus wherein the various parts or components work together so as to operate in a manner that *does* constitute an unlawful slot machine or device." **3**

We agree. Indeed, a contrary view would mean that, again to quote the Court of Appeal, "even a casino-style slot machine would be legal as long as it was operated by a computer system that had previously arranged the sequence of entry results in a fixed order. Such a computer system might conceivably frontload hundreds of millions of discrete entry results into a predetermined sequence. A customer using that device would be surprised to learn that merely because there is a preset sequence, he is not playing a game of chance." The Legislature cannot have intended and, more importantly, section 330b's language does not permit, the conclusion that a business in California may lawfully operate traditional Las Vegas-style slot machines — with spinning wheels and everything else one associates with slot machines — merely by inserting into them software created elsewhere that presets the results. As the Court of Appeal aptly analogized, "whether a deck of cards was shuffled the day before, or at the moment the player sits down at the table and places a bet, it is still a matter of chance whether the ace of spades is the next card dealt."

From all this, and as applicable here, we think the core elements of section 330b, subdivision (d), can be distilled as follows: A device that (1) rewards purchasers of usable products, including but not limited to, telephone and Internet time, with sweepstakes points, and (2) allows those purchasers to redeem their

---

**3**     We note that under some circumstances slot machines may be seized and ultimately disposed of. (§ 330.3.) Section 330.3 does not cross-reference section 330b, subdivision (d)'s definition of a slot machine. We express no opinion on the separate question of to what extent the integrated components of a slot machine under section 330b may be subject to seizure under section 330.3.

20

sweepstakes points by playing games that award cash or other prizes of value, is a slot machine, where that device, (3) standing alone or used in conjunction with other electronic or mechanical components, (4) when operated by insertion of a PIN, account number, or magnetic card, or by any other means, (5) awards cash or other prizes of value to users, or entitles those users to such cash or other prizes of value, and (6) does so by arranging or prearranging winning sweepstakes entries in a manner that is unpredictable to the user.

*Pacific Gaming Technologies*, *supra*, 82 Cal.App.4th 699, supports this conclusion.  As the Court of Appeal in *Grewal* explained, in *Pacific Gaming Technologies*, " '[a] preset computer program determine[d] the results of the sweepstakes.' (*Id*. at p. 702.)  The machine or device in that case (a 'VendaTel' that distributed a telephone card to each customer while entering them in a chance to win a prize) had a ' "10 percent payout structure" ' where it would 'pay[] out $500 in prizes for every $5,000 paid into the machine' with ' "predetermined winners" spread out over a period of time.' (*Id*. at p. 702, fn. 4.)  Under those facts, the Court of Appeal held that the users of the device became entitled to receive cash prizes '*purely by chance* (without any skill whatsoever).' (*Id*. at p. 703, italics added.)  The same is true here.  Even if the sequence of entries has been electronically frontloaded into defendants' integrated system, patrons win cash prizes based upon 'hazard or chance or of other outcome of operation unpredictable by [the patron]' in violation of section 330b, subdivision (d)."  The court in *Lucky Bob's*, *supra*, 2013 U.S. Dist. LEXIS 62470, 2013 WL 1849270, reached a similar conclusion.

Defendants argue that the devices are not slot machines because the element of consideration is lacking.  Again, we agree with the Court of Appeal's response to this argument.  "We find the argument unpersuasive.  Unlike section 319 (regarding lotteries), section 330b does not directly specify that consideration

21

is an element.  Therefore, it would seem that as long as the express statutory elements of section 330b are satisfied, no separate showing of consideration is needed.  In other words, to the extent that consideration is a factor under section 330b, it is simply subsumed by the existing statutory elements.  Since those elements were shown here, nothing more was required.  (*Trinkle v. Stroh*, *supra*, 60 Cal.App.4th at pp. 780-781.)  Other cases have essentially followed this approach by concluding that even if consideration is necessary in slot machine cases, its existence will be found where a connection exists between purchasing a product from a vending machine or device and being given chances to win a prize.  (*Id*. at pp. 781-782; *People ex rel. Lockyer v. Pacific Gaming Technologies*, *supra*, 82 Cal.App.4th at pp. 705-706.)  ' "Once the element[s] of chance [and prize]" ' are added to a vending machine or device, it is reasonable to assume that ' "people are no longer paying just for the product regardless of the value given that product by the vender." ' (*Trinkle v. Stroh*, *supra*, at p. 782; accord, *People ex rel. Lockyer v. Pacific Gaming Technologies*, *supra*, at pp. 704-707.)  That is the case here as well, since points are given to play the computer sweepstakes games on defendants' terminals based on dollars spent in purchasing products — that is, the elements of chance and prize are added to the purchase."

"[T]his construction reflects the Legislature's recognition 'that once the elements of chance and prize are added to a vending machine, the consideration paid from the player-purchaser's perspective is no longer solely for the product.' [¶]  . . .  An otherwise illegal machine does not become legal merely because it plays music, gives a person's weight, vends food, etc." (*Trinkle v. Stroh*, *supra*, 60 Cal.App.4th at p. 782 [quoting the trial court in that case].)

Defendants Nasser and Elmalih argue the systems do not operate by hazard or chance or some other unpredictable operation because users have the option of obtaining an immediate result without playing any of the computer games.  This

22

circumstance does not negate the elements that make the computer games illegal slot machines.  The fact that users need not swipe a card or enter a number into the computer terminal and then play a casino-style game in order to obtain a result, does not make the system any less of a slot machine when they do swipe the card or enter the number and do play the casino-style game.  When the user, by some means (here swiping a card or entering a number), causes the machine to operate, and then plays a game to learn the outcome, which is governed by chance, the user is playing a slot machine.

Two additional circumstances in this case tend to confirm that defendants were actually conducting gambling enterprises of the type section 330b is intended to control.  First, although a device need not generate a random outcome at the time of play, we think it significant that these systems are *specifically designed* to cultivate the impression that the user may receive a reward "by reason of any element of hazard or chance or of other outcome of operation unpredictable by him or her."  (§ 330b, subd. (d).)  In contrast, a lottery ticket vending machine is transparent insofar as the design itself conveys to the customer that the dispenser has nothing to do with the chance element.  A customer can watch the next ticket fall from its holder, a straightforward proposition imbued with no particular suspense; the appearance of chance comes into play only once the lottery ticket is in hand.  This distinction would seem to track the central policy rationale for categorizing defendants' systems as slot machines.  They are attempts to recreate the sensation of playing with a device that itself generates the chance element.

Second, it is clear defendants' customers were not merely buying the product that made them eligible to play the sweepstakes games — Internet or telephone time — but also, and perhaps primarily, the sweepstakes games.  In *Lucky Bob's*, the record showed that most of the Internet time ostensibly sold was never used.  (*Lucky Bob's*, *supra*, 2013 U.S. Dist. LEXIS 62470 at p. *3, 2013 WL

1849270, at p. *2.) The record here is not as clear, but at least sometimes, customers who ostensibly bought Internet time seemed to spend more time playing the games than using the Internet. The evidence shows that customers who ostensibly bought telephone cards never used some two-thirds of the purchased telephone time. It is true, as defendants argue, that the businesses offered a limited number of sweepstakes entries for no charge. But the customers were nonetheless clearly paying, at least in part, and, it appears, in large part, for the opportunity to play the casino-style sweepstakes games and win cash prizes. Or, as the People put it, defendants' "sweepstakes are actual games of chance played for money by patrons to win cash prizes."

Defendants make various other arguments against finding the devices to be slot machines. They argue the Court of Appeal violated principles of stare decisis in not following *State Lottery*, *supra*, 105 Cal.App.4th 1401. But nothing about stare decisis prevents courts from fairly distinguishing cases. *State Lottery* is entirely distinguishable. Indeed, the various cases finding similar devices to be slot machines, which we are following, are closer on point.

Defendants claim they had insufficient notice that their devices would be deemed slot machines. They argue the so-called rule of lenity, "whereby courts must resolve doubts as to the meaning of a statute in a criminal defendant's favor" (*People v. Avery* (2002) 27 Cal.4th 49, 57), mandates a finding that the devices are legal. The rule of lenity exists to ensure that people have adequate notice of the law's requirements. But the rule applies only when two reasonable interpretations of a penal statute stand in relative equipoise. "[A]lthough true ambiguities are resolved in a defendant's favor, an appellate court should not strain to interpret a penal statute in defendant's favor if it can fairly discern a contrary legislative intent." (*Id.* at p. 58.) Here, there is no relative equipoise. We can fairly discern

24

the Legislature's intent. The devices at issue clearly come within section 330b, subdivision (d)'s definition of a slot machine.

Defendants also argue that any ruling that their devices are slot machines would be " 'an unforeseeable judicial enlargement of' " a criminal statute that may only be applied prospectively. (*People v. Whitmer* (2014) 59 Cal.4th 733, 742.) But all that we are reviewing at this time is the trial court's issuance of the preliminary injunctions. An injunction operates in the future; it "is aimed at preventing future conduct — conduct after the issuance of the injunction." (*Cal-Dak Co. v. Sav-On Drugs, Inc.* (1953) 40 Cal.2d 492, 496.) We express no view on what other remedy, if any, might be appropriate in this case.

Defendants also argue that the Legislature's inaction signals its approval of *State Lottery*, *supra*, 105 Cal.App.4th 1401. They note that the Legislature has amended section 330b multiple times since that decision but has not overruled it. "In some circumstances, legislative inaction might indicate legislative approval of a judicial decision." (*People v. Whitmer*, *supra*, 59 Cal.4th at p. 741.) It is unclear how this concept would apply here because the Legislature has overruled neither *State Lottery*, which is distinguishable, nor any of the cases finding devices similar to the ones here to be illegal slot machines. For purposes of discussion, we may assume that the Legislature's failure to overrule *State Lottery* might indicate its approval of that case's holding. But that holding was that the California State Lottery may sell lottery tickets in vending machines. The Legislature's inaction does not signal approval of all of the analysis leading to that holding, and certainly not approval of defendants' view of how that analysis applies to this case.

Defendants assert that the devices here have features in common with sweepstakes operated by national companies like Coca-Cola and McDonalds, and that a holding that the devices here are illegal slot machines would mean those and similar sweepstakes are also illegal slot machines. How similar the devices here

25

are to other sweepstakes, and whether other sweepstakes would meet all of the elements set forth in section 330b, subdivision (d), is beyond the scope of this case. Such questions would have to be decided in a case in which someone claims some other sweepstakes system is an illegal slot machine. Like a New Mexico court confronted with a similar argument, "we will not substitute our sufficiency of the evidence analysis with an evaluation of the numerous other sweepstakes-type promotions conducted in New Mexico [or California] by other national companies who are not defendants in this proceeding." (*State v. Vento* (N.M.App. 2102) 286 P.3d 627, 634.)

The parties also note that, during the pendency of this case, the Legislature amended Business and Professions Code section 17539.1 in a way that appears to prohibit sweepstakes games like those of this case. (Stats. 2014, ch. 592, § 1, chaptering Assem. Bill No. 1439 (2013-2104 Reg. Sess.).)[4] The meaning and application of this amendment is beyond the scope of this opinion. But its existence does not make this matter moot; we are deciding whether the trial court

---

[4]    As amended, Business and Professions Code section 17539.1, subd. (a)(12), prohibits: "Using or offering for use any method intended to be used by a person interacting with an electronic video monitor to simulate gambling or play gambling-themed games in a business establishment that (A) directly or indirectly implements the predetermination of sweepstakes cash, cash-equivalent prizes, or other prizes of value, or (B) otherwise connects a sweepstakes player or participant with sweepstakes cash, cash-equivalent prizes, or other prizes of value. For the purposes of this paragraph, 'business establishment' means a business that has any financial interest in the conduct of the sweepstakes or the sale of the products or services being promoted by the sweepstakes at its physical location. This paragraph does not make unlawful game promotions or sweepstakes conducted by for-profit commercial entities on a limited and occasional basis as an advertising and marketing tool that are incidental to substantial bona fide sales of consumer products or services and that are not intended to provide a vehicle for the establishment of places of ongoing gambling or gaming."

26

properly issued a preliminary injunction after finding the devices to be illegal slot machines under section 330b.

Defendants contend, however, that the recent legislation supports the argument that their devices are not unlawful slot machines under section 330b. They cite committee reports expressing the belief that currently the devices might not be prohibited. For example, one report states, "As long as there is a legitimate free method of entry into the sweepstakes or promotion, the consideration element is absent, and the 'sweepstakes' is not an illegal lottery. According to the Senate Governmental Organization Committee, it appears that most Internet cafés are not operating illegal lotteries under California law." (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 1439 (2013-2014 Reg. Sess.) as amended Aug. 21, 2014, p. 3.)

Aside from the fact that this and similar committee reports refer to illegal lotteries and not illegal slot machines, at most they indicate a *belief* that devices like those of this case might not currently be prohibited, and they suggest the Legislature amended Business and Professions Code section 17539.1 to ensure that at least they would be unlawful in the future. The reports do not, and cannot, restrict our interpretation of section 330b. The judicial, not legislative, branch interprets statutes, and a legislative belief regarding the meaning of earlier legislation has little weight. (*People v. Cruz* (1996) 13 Cal.4th 764, 780-781.) Nothing in the Legislature's recent action prevents us from applying section 330b's plain language.

### III. CONCLUSION

We affirm the judgments of the Court of Appeal.

**CHIN, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**WERDEGAR, J.**
**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**

**Name of Opinion** People v. Grewal and People v. Nasser

_____

**Unpublished Opinion** NP opn. filed 3/10/14 – 6th Dist. (Nasser)
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 224 Cal.App.4th 527 (Grewal)
**Rehearing Granted**

_____

**Opinion No.** S217896 & S217979
**Date Filed:** June 25, 2015

_____

**Court:** Superior
**County:** Kern
**Judge:** William D. Palmer

_____

**Counsel:**

Weston, Garrou & Mooney, John H. Weston, G. Randall Garrou and Jerome H. Mooney for Defendants and Appellants Kimpal Grewal and Philip Ernest Walker.

William H. Slocumb, Christopher T. Reid; Hunt Jeppson & Griffin and Tory E. Griffin for Defendant and Appellant John C. Stidman.

Steven Graff Levine; Dowling Aaron, Daniel K. Klingenberger, Lynne Thaxter Brown and Stephanie Hamilton Borchers for Defendants and Appellants Kamal Kenny Nasser and Ghassan Elmalih.

Downey Brand, Stephen J. Meyer, Tory E. Griffin and Kelly L. Pope for Net Connection Hayward, LLC, as Amicus Curiae on behalf of Defendants and Appellants.

Lisa S. Green, District Attorney, Gregory A. Pulskamp and John T. Mitchell, Deputy District Attorneys, for Plaintiff and Respondent.

Kamala D. Harris, Attorney General, Sara J. Drake, Assistant Attorney General, and William L. Williams, Jr., Deputy Attorney General, for Attorney General for the State of California as Amicus Curiae on behalf of Plaintiff and Respondent.

Mark L. Zahner and Gary Koeppel, Deputy District Attorney, for California District Attorneys Association as Amicus Curiae on behalf of Plaintiff and Respondent.

Mayer Brown and Donald M. Falk for Viejas Band of Kumeyaay Indians and Lytton Rancheria of California as Amici Curiae on behalf of Plaintiff and Respondent.

Matthew J. Geyer; Bien & Summers, Elliot L. Bien and Jocelyn S. Sperling for GTech Corporation as Amicus Curiae on behalf of Plaintiff and Respondent.

Liner, Joseph R. Taylor and Tiffany R. Caterina for California Gaming Association as Amicus Curiae on behalf of Plaintiff and Respondent.

Reed Smith, Paul D. Fogel and Dennis Peter Maio for California State Lottery as Amicus Curiae on behalf of Plaintiff and Respondent.

1

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

John H. Weston
Weston, Garrou & Mooney
12121 Wilshire Boulevard, Suite 525
Los Angeles, CA  90025
(310) 442-0072

Tory E. Griffin
Hunt Jeppson & Griffin
1478 Stone Point Drive, Suite 100
Roseville, CA  95661
(916) 780-7008

Steven Graff Levine
1112 Montana Avenue, #309
Santa Monica, CA  90403
(310) 497-1974

Gregory A. Pulskamp
Deputy District Attorney
1215 Truxtun Avenue, 4th Floor
Bakersfield, CA  93301
(661) 868-1659